UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADT LLC, and ADT US HOLDINGS, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| Vs. | § | |
| | § | Civil Action No.: 15-2252 |
| CAPITAL CONNECT, INC.; POWER HOME | § | |
| TECHNOLOGIES, LLC;  SECURITY | § | |
| INVESTMENTS LLC; ALLIANCE SECURITY | § | |
| INC.; MAXIMUM SECURITY ALARM, | § | |
| INC.;JOHN LEE; JOHN BACKUS; VICTOR | § | |
| VEGA; TREVOR MCALEES; and ANTHONY | § | |
| BONARDI, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

Plaintiffs ADT LLC and ADT US Holdings, Inc. (collectively, "ADT" or "Plaintiffs"), through undersigned counsel, bring this action for damages and injunctive relief against Capital Connect, Inc. ("Capital Connect"), Power Home Technologies, LLC ("Power Home"), Security Investments LLC ("Security Investments"), Alliance Security, Inc. ("Alliance Security"), Maximum Security Alarm, Inc. ("Maximum Security"), John Lee ("Lee"), John Backus ("Backus"); Victor Vega ("Vega"); Trevor McAlees ("McAlees"); and Anthony Bonardi ("Bonardi") (collectively, "Defendants"), and in support allege:

### I.      PARTIES

1.       Plaintiff ADT US Holdings, Inc., is a Delaware corporation with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431.   ADT US Holdings is a holding company that owns, *inter alia*, the ADT trademarks, including without limitations 21 ADT live word trademarks featuring the letters "A – D – T," registered in the United States

Patent & Trademark Office that bear the registration numbers 3251836, 3352491, 710708, 710507, 3515266, 3515266, 3511263, 3445423, 3909665, 3485321, 3421797, 1034716, 838956, 803247, 846966, 3348663, 3253804, 3445420, 3991449, 3335239, 3335298, and 3427081 ("ADT Trademarks").

2.      Plaintiff ADT LLC is a Delaware limited liability company with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431.  ADT LLC is an operating company that runs the ADT alarm services business in the United States.  ADT LLC uses the ADT Trademarks under licenses from ADT US Holdings.

3.      ADT was separated from its former parent, Tyco International, effective October 1, 2012, through a restructuring that made ADT a publicly-owned company traded on the New York Stock Exchange.  ADT succeeds to all rights and property of the former ADT business, including all causes of action accruing to ADT prior to October 2012, and all rights to the ADT Trademarks and other ADT intellectual property.

4.      Defendant Capital Connect, Inc. is a corporation organized under the laws of Arizona with its principal place of business located at 2900 E. Broadway Blvd., #113, Tucson, Arizona, 85716.  Capital Connect's registered agent for service of process is Garrett Rustand, 2900 E Broadway Blvd, #113, Tucson, Arizona, 85716.

5.      Defendant Power Home Technologies, LLC is a limited liability company organized under the laws of North Carolina with its principal place of business located at 4521 Preslyn Drive, Raleigh, North Carolina, 27616-3178.  Power Home's registered agent for service of process is CT Corporation System, 150 Fayetteville Street, Box 1011, Raleigh, North Carolina, 27601-2957.

6.     Defendant Security Investments LLC is a limited liability company organized under the laws of Ohio with its principal place of business located at 132 Dorchester Square, Suite 200, Westerville, Ohio, 43081.   Security Investments' registered agent for service of process is National Registered Agents, Inc., 1300 East Ninth Street, Cleveland, Ohio, 44114.

7.     Defendant Alliance Security Inc. is a corporation organized under the laws of Delaware with its principal place of business located at 60 Jefferson Park Road, Warwick, Rhode Island, 02888.   Alliance Security's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

8.     Defendant Maximum Security Alarm, Inc. is a corporation organized under the laws of Nevada with its principal place of business located at 1010 Hurley Way, Suite 525, Sacramento, California 95825.   Maximum Security's registered agent for service of process is Incorp Services, Inc., 2360 Corporate Circle, Suite 400, Henderson, Nevada, 89074.

9.     Defendant John Lee is a resident of the state of Texas.   Upon information and belief, Lee was a sales representative on behalf of Capital Connect.

10.     Defendant John Backus is a resident of the state of California.   Upon information and belief, Backus was a sales representative on behalf of Capital Connect.

11.     Defendant Victor Vega is a resident of the state of Texas.   Upon information and belief, Vega was a sales representative on behalf of Capital Connect.

12.     Defendant Trevor McAlees is a resident of the state of Florida.   Upon information and belief, McAlees was a sales representative on behalf of Capital Connect.

13.     Defendant Anthony Bonardi is a resident of the state of Florida.   Upon information and belief, Bonardi was a sales representative on behalf of Capital Connect.   This

Complaint refers to Defendants Bonardi, Lee, Backus, Vega and McAllees collectively as the "Individual Defendants."

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action presents a federal question under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

15.     This Court has supplemental jurisdiction over the state law claims also asserted in this action pursuant to 28 U.S.C. §1367(a).

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial number of events giving rise to the claims asserted in the Complaint occurred in this District.   Specifically, Defendants sell the alarm accounts that they procure to Monitronics International, Inc. ("Monitronics"), which has its principal place of business in Dallas, Texas.

17.     Venue is also proper in in this District because many of the acts at issue in this case were committed in this District, and customer confusion occurred in this District.

## FACTS COMMON TO ALL COUNTS

18.     ADT, founded in 1874, is the oldest, largest and best-known provider of electronic security services.   ADT provides electronic security services to residences and businesses in over 200 major markets nationwide.

19.     ADT's name and Trademarks are registered with the United States Patent and Trademark Office.

20.     Defendants are each alarm company dealers or representatives of alarm company dealers, selling and installing alarm systems in direct competition with ADT.   After selling and installing a new alarm system, Defendants sell the new customer contract to Monitronics, another direct competitor of ADT.   Monitronics then monitors the new customer's alarm system.

21.     Defendants, at all times material hereto, were Monitronics dealers, or sales agents selling alarm contracts for Monitronics' benefit.   Monitronics generates customers through its dealer program whereby dealers, like Defendants, sell and install security systems monitored by Monitronics and then enter into contracts with customers for alarm monitoring and/or other security-related services.   The dealers, pursuant to their exclusive contracts with Monitronics, then sell the customer contracts to Monitronics.

22.     As a direct competitor of ADT, Monitronics provides security monitoring services to its customers.   Neither ADT nor Monitronics makes alarm equipment.   Instead, a few companies such a GE Security, Honeywell, and 2GIG supply alarm panels and sensors to all sellers of alarm systems in the United States.

23.     Monitronics paid Defendants consideration for each customer contract Monitronics acquired from Defendants.

24.     Customers who have monitoring services with Monitronics are in privity with Monitronics and pay a monthly fee directly to Monitronics.   Monitronics primarily monitors its customers' accounts and provides billing services through its company's central monitoring station in Dallas, Texas.

25.     ADT operates in each of the states in which Defendants market and sell security equipment and monitoring services.

26.     Upon information and belief, Defendants are using the ADT trade name to take over ADT alarm accounts and to sell those accounts to Monitronics.

27.     Upon information and belief, sales agents of each Defendant, including the Individual Defendants, made false and misleading statements to ADT customers that they were representatives of, employed by, or otherwise directly associated with ADT or the manufacturer

of the customers' alarm systems being monitored by ADT.  These and other false and misleading statements by Defendants caused ADT customers to believe they were talking with ADT's representatives, or with the manufacturer of their alarm equipment monitored by ADT.

28.     One false sales pitch used by Defendants, as described in detail below, involved representatives of each Defendant going to ADT customers' homes representing that they were with ADT and offering to provide the customer with an "upgrade" of the customer's security equipment.  The false and misleading statements by the Individual Defendants and sales representatives of each Defendant led the ADT customers to believe that they were speaking with people affiliated with ADT and were being offered an upgrade as part of an ADT program.

29.     Instead of installing an ADT upgrade, however, Defendants were causing ADT customers to terminate their existing ADT agreements and execute new customer contracts with Defendants, which would then be sold to ADT's competitor, Monitronics.

30.     Another type of false sales pitch Defendants used, as described in detail below, involved representatives of each Defendant making false and misleading statements to ADT customers regarding ADT's business and monitoring services.  These false and misleading statements include but are not limited to statements that ADT was "going out of business," or that a Defendant was "taking over" ADT accounts in a particular area.

31.     From 2013 to the present, ADT has received hundreds of complaints from its customers regarding Monitronics representatives engaging in deceptive practices similar to those described herin.  Because Monitronics does not employ a sales force and, instead, relies on dealers, upon information and belief, it is likely that many of the complaints attributed to Monitronics are actually caused by the Defendant dealers.

32.     Defendants' use of the same false sales pitches constitutes a series of transactions or occurrences that give rise to common questions of law.

33.     Defendants' false sales pitches are injuring ADT by confusing them as to the Defendants' affiliation.  They are causing ADT customers to terminate their existing contracts with ADT and enter into new customer contracts with Defendants, which Defendants then assign and sell to Monitronics.

34.     Defendants' false representations to ADT customers regarding ADT's business and monitoring services damage ADT's goodwill and reputation as a reliable provider of security services.

35.     As a result of Defendants' practices, a number of ADT customers have unwittingly found themselves with security systems installed in their homes by Defendants, and with contractual obligations to both ADT and one of the Defendants.  In some instances, ADT has been required to send technicians to the deceived customers' homes to reinstall the removed ADT equipment, at considerable expense to ADT.  In other situations, the customers retained their systems with the Defendants and terminated their contracts with ADT.

36.     Such practices, as alleged in greater detail below, violate statutory and common-law prohibitions against the use of false sales pitches that are likely to confuse customers. They also violate the security systems industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name ... at the initiation of a sales presentation, without request from the consumer," and which prohibits, *inter alia*, false claims that (a) a competitor is going out of business, (b) the company is taking over a competitor's accounts, or (c) the company is providing an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

37.     On information and belief, some of the Defendants ask customers to execute documents at the end of a sales call to acknowledge the customer's understanding that the Defendants' sales agent does not represent ADT.   The Defendants' efforts to clarify their affiliation at the time a sale occurs, however, does not cure the confusion these false pitches cause at the outset of the sales call.   Defendants, through their sales agents (including the Individual Defendants), use these false sales pitches in unannounced "cold" sales calls to ADT's customers to gain the customers' trust – literally, in this case, to get a foot in the door. The initial confusion caused by these pitches enable the Defendants to engage the ADT customer in a sales pitch.  The initial confusion violates the law, and later efforts to clarify the agents' affiliation are ineffective in correcting the effects of the initial confusion caused by the false pitch.

## Capital Connect Wrongfully Induces ADT Customers to Change Service

38.     Capital Connect is a dealer in the alarm systems market that enters into alarm monitoring contracts with customers and then sells the customer contracts to Monitronics, located in Dallas, Texas.

39.     The Individual Defendants are sales agents for Capital Connect.  The Individual Defendants market alarm systems and cause customers to enter into alarm monitoring contracts, which are then sold to Monitronics.

40.     From 2013 to the present, ADT has received over 300 complaints from customers who have encountered Capital Connect's false pitches.  Some of these complaints are described below.

41.     Upon information and belief, Capital Connect's sales agents, including the Individual Defendants, have been using false sales pitches to take over ADT alarm accounts and to sell those accounts to Monitronics.

42.     In an effort to stop Capital Connect use of false pitches, ADT sent cease and desist letters to Capital Connect on October 10, 2014, March 25, 2015, and April 17, 2015. ADT's letters, however, appear to have had the opposite of their intended effect.  ADT has received customer reports of over 90 new incidents involving Capital Connect sales agents occurring within the past seven weeks.

43.     Capital Connect's sales agents, including the Individual Defendants, are making false statements to ADT customers that the agents are representatives of, employed by, or otherwise directly associated with ADT or the manufacturer of the customers' alarm systems being monitored by ADT, usually under the pretext that they are providing an "upgrade."  These and other false statements by Capital Connect's agents confused the ADT customers into believing they were talking with representatives of ADT or with the manufacturer of their alarm equipment, when in fact the agents represented ADT's competitors.

44.     For example, in June 2013, ADT customer, Chandrell Larkin, in Miami Gardens, Florida, reported to ADT that a Capital Connect representative came to her door and told the customer that he worked for the company that makes and maintains the alarm equipment installed by ADT.  He also told Ms. Larkin that young kids in the area were cutting phone wires connected to alarm systems which would cut off signals to ADT and that Ms. Larkin needed to upgrade her equipment to wireless as a result.

45.     In February 2014, ADT customer D.K.[1] in Dallas, Texas, reported to ADT that a Capital Connect representative came to her house to replace the customer's keypad, stating that she worked for the company that made the customer's equipment.  The representative also told

---

[1]   Some but not all ADT customers have given ADT permission to use their names and personal information in this Complaint.  The Complaint identifies those who have not given consent by initials.  ADT is providing identifying information consistent with the pleading requirements of Rule 9(b) in an accompanying Exhibit filed concurrently under seal.

D.K. that Capital Connect does not have a phone number or business cards because no one calls them.

46.     In April 2014, ADT customer L.B. in Dallas, Texas, reported to ADT that a Capital Connect representative told the customer that they work with ADT and attempted to upgrade the customer's panel.

47.     In April 2014, ADT customer S.D. in Dallas, Texas, reported to ADT that a Capital Connect representative came to the customer's house to "upgrade" the customer's system.  S.D. subsequently received a bill stating that payments were to be sent to Monotronics, P.O. Box 814530, Dallas, Texas, 75381-4530.

48.     In April 2014, ADT customer A.B. in Tempe, Arizona, reported to ADT that Capital Connect representative John Backus arrived at the ADT customer's home within minutes after an actual ADT technician was at the customer's home.  Backus told the ADT customer's 83-year-old mother that he was at the house to "upgrade" the equipment.  Backus proceeded to remove the customer's ADT equipment and install new equipment.

49.     In May 2014, ADT customer P.C. in Dallas, Texas, reported to ADT that Capital Connect representatives told P.C. that they were "contracted with ADT" and refused to give P.C. a business card when asked.

50.     In June 2014, ADT customer L.S. in El Paso, Texas, reported to ADT that Capital Connect representative Anthony Bonardi knocked on L.S.'s door and stated that he needed to "update" the customer's alarm system.  Bonardi told L.S. that older security systems delayed the police response time and that newer systems could reduce response time.

51.     In July 2014, ADT customer P.D. in Clinton, Maryland, reported to ADT that a Capital Connect salesperson wearing an ADT polo shirt came to P.D.'s house to "upgrade" the

security system.  P.D. reported to ADT that it was not until after the installation was complete that P.D. learned that a different company was providing monitoring services.  That company was Monitronics.

52.     In July 2014, ADT customer C.B. in El Paso, Texas, reported to ADT that Capital Connect representative Anthony Bonardi came to C.B.'s home stating that he was with Honeywell and wanted to inform C.B. that her equipment was outdated.  C.B. did not let Bonardi install new equipment.

53.     In July 2014, ADT customer R.S. in El Paso, Texas, reported to ADT that Capital Connect representative Trevor McAlees came to R.S.'s door and stated that he works for Capital Connect, which is a contractor for Honeywell.  McAlees also stated that he needed to access R.S.'s panel in his security equipment in order to give R.S. a free upgrade.

54.     In August 2014, ADT customer F.R. in Victorville, California, reported to ADT that two Capital Connect representatives told her that they were sent by ADT to schedule changes to her keypad.  They informed F.R. that her security system was disconnected and that they would need to replace the keypad in order to reconnect her service, despite the fact that F.R.'s ADT system was actually connected and functioning.  F.R. executed a new contract based on the Capitol Connect representatives' misrepresentations.

55.     In August 2014, ADT customer P.O. in Colton, California, reported to ADT that Capital Connect representative John Lee came to P.O.'s house stating that P.O.'s alarm equipment was faulty.  Lee stated that he was with the manufacturer of P.O.'s equipment and wanted to upgrade the customer's security system.

56.     In October 2014, ADT customer H.S. in Dallas, Texas, reported to ADT that a Capital Connect representative told H.S. that he was with the company that installed ADT's

equipment and that he needed to know what type of system H.S. had because the representative was going to upgrade it.

57.     In October 2014, ADT customer D.G. in Cape Code, Florida, reported to ADT that Anthony Bonardi told the customer that he was with Honeywell and that D.G. may have a "defective" keypad.  Bonardi told D.G. that he wanted to make sure the keypad was not defective and if it was, he would replace the keypad for free.  D.G. told Bonardi that he wanted to confirm with ADT before having new equipment installed.

58.     In November 2014, two representatives came to 86-year-old ADT customer Doris Rohl's home in Yorba Linda, California.  One representative introduced himself as Tommy Southard and stated he was at her home to "upgrade" her ADT equipment.  While Mr. Southard was telling Ms. Rohl about the features of the "upgrade", the other representative removed her ADT equipment and installed the "upgraded" equipment.  Mr. Southard had Ms. Rohl execute a document, which she believed to be a work order, but turned out to be a contract with Capital Connect.  Ms. Rohl later found out that Capital Connect was not affiliated with ADT.

59.     In December 2014, three ADT customers in Houston, Texas, reported deceptive conduct involving Defendant John Lee.  First, ADT customer T.M. reported to ADT that Capital Connect representative John Lee told T.M. that ADT contracted with him to change T.M.'s keypad.  Lee also falsely informed T.M. that a new law required T.M. to change the keypad by the next Monday; otherwise, she would get a ticket.  T.M. reported to ADT that Lee was insistent upon entering her home, but she refused and asked him to leave a business card instead.  The business card identified Lee's affiliation with Capital Connect.  T.M. reported to ADT that the customer later filed a police report regarding her interaction with Lee.

60.     A second ADT customer in Houston, Texas, Larry Scott, reported to ADT that John Lee came to Mr. Scott's home stating that Honeywell owned Mr. Scott's keypad and that he had to change the customer's keypad for free.  According to Mr. Scott, Lee stated that intruders could cut phone lines, which would prevent ADT from getting a signal.  Also, Lee told Mr. Scott that, in an emergency, ADT would have to call Mr. Scott and then call the police because ADT is not located in Houston.  Mr. Scott told Lee that he wanted to contact ADT.

61.     A third ADT customer in Houston, Texas, Annie May Edwards, who is 91 years old, reported to ADT that John Lee went to the customer's house stating that he was at Ms. Edwards's house to replace her keypad, which led Ms. Edwards to believe Lee was from ADT. Lee had Ms. Edwards execute a contract and arranged for an installation that same day.  When Ms. Edwards reviewed the documents Lee gave her, she realized she had been misled to believe Lee was from ADT.  Ms. Edwards cancelled with Capital Connect and scheduled ADT to reinstall her equipment.

62.     In January 2015, ADT customer Martin Price in Fort Worth, Texas, reported to ADT that a Capital Connect representative came to Mr. Price's door stating that she was with ADT and was there to upgrade his system.  Mr. Price told the Capital Connect representative that he just called ADT to report an issue, and the representative responded, "I know that's why I am here; your equipment needs to be upgraded." The representative had Mr. Price execute a new contract and asked him to write a check to Capital Connect.  When Mr. Price asked "Capital Connect?  I thought you were with ADT", the representative said that Capital Connect was affiliated with ADT.  Mr. Price wrote Capital Connect the check and arranged for installation of the "upgraded" equipment.

63.     In February 2015, ADT customer F.M. in Garland, Texas, reported to ADT that Capital Connect representative Victor Vega came to her house stating that F.M.'s system was "old" and that he would upgrade her system for free.  He also stated that ADT would charge her for an upgrade.

64.     Also in February 2015, ADT customer E.R. in Garland, Texas, reported to ADT a Capital Connect representative named Victor Edson told the customer that he works for ADT and was at the customer's house to change the customer's system. The representative also said that E.R.'s system is outdated and that ADT was replacing systems. Victor Edson is believed to be Victor Vega.

65.     In March 2015, ADT customer M.H. in Dallas, Texas, reported to ADT that Capital Connect representative named Victor Edsun came to her home stating that her keypad needed to be replaced and that Capital Connect was connected with ADT.  Victor also told M.H. that ADT had been trying to call her to set up the upgrade but that she was not answering.  M.H. called ADT to verify the accuracy of Victor's representations.   Victor Edsun is believed to be Victor Vega.

66.     In March 2015, another ADT customer in Dallas, Texas, S.R., reported to ADT that a Capital Connect representative stated that she was sent to change S.R.'s security panel. The representative left S.R.'s  house when S.R. stated she was going to call ADT.

67.     In March 2015, another ADT customer in Dallas, Texas, B.F., reported to ADT that a Capital Connect representative tried to replace the customer's panel to "upgrade" the system.  The customer called the police because the customer had not called ADT.

68.     In March 2015, another ADT customer in Dallas, Texas, P.P., reported to ADT that a Capital Connect representative tried to replace the customer's keypad stating that the customer would stay with ADT after the keypad was replaced.

69.     In March 2015, another ADT customer in Dallas, Texas, J.G., reported to ADT that a Capital Connect representative stated that he was at J.G.'s house to "upgrade" the security system.  J.G. refused to let the representative in the house.

70.     In March 2015, ADT customer T.J. in Tampa, Florida, reported to ADT that Capital Connect representative Alexis Cardwell went to the customer's house initially stating that she was with ADT and was visiting to upgrade the customer's equipment.  T.J. pressed Cardwell, stating that ADT usually calls before coming to her house.  In response, Cardwell stated that she was with Capital Connect which is the company that makes ADT equipment. Cardwell then told the customer that ADT should have updated the customer's equipment three years ago and that she was going to report ADT to the Better Business Bureau for failing to perform the necessary upgrades.

71.     In April 2015, ADT customer B.H. in Fort Worth, Texas, reported to ADT that a Capital Connect representative named Alexis claimed to be with ADT.  Alexis told B.H. that B.H.'s security system was outdated and needed to be updated.  B.H. did not let Alexis "update" his equipment.

72.     In April 2015, ADT customer E.L. in Garland, Texas, reported to ADT that a Capital Connect representative told her that ADT sent him to upgrade her equipment.  The customer refused and reported to ADT that the representative had a list of ADT customers.

73.     Representatives of Capital Connect also made false and misleading representations about ADT's business and its monitoring services for alarm accounts.

74.     For example, in March 2013, a representative by the name of Gary Gatehouse told 77-year-old ADT customer Dolores Ruiz in Elk Grove, California, that he was with Capital Connect and that ADT was "going out of business."  He also stated that because Capital Connect was taking over ADT's accounts in the area, he needed to "upgrade" Ms. Ruiz's security system by replacing her equipment with Capital Connect's equipment.  Based on these misrepresentations, Ms. Ruiz executed a contract and allowed the representative to install new equipment in her home.  Ms. Ruiz discovered that ADT had not gone out of business when an ADT employee called Ms. Ruiz to notify her that he had received a cancellation letter prepared by Mr. Gatehouse. Ms. Ruiz reported to ADT that she was happy with ADT's service and would have continued service with ADT had it not been for the Capital Connect agent's false sales pitch.

75.     In July 2013, 68-year-old ADT customer Linda Niem in Napa, California, reported to ADT that a man named Jacob Browning from Capital Connect told her that ADT was "going out of business" and that Capital Connect was instructed to take over ADT accounts in Ms. Niem's area.  Based on Mr. Browning's misrepresentations, Ms. Niem signed a contract agreeing to the installation of new equipment.  After the new equipment was installed, Ms. Niem realized ADT was not going out of business and that her monitoring services with ADT were cancelled.

76.     In March 2014, ADT customer J.A. in Dallas, Texas, reported to ADT that a Capital Connect sales agent came to her house informing her that the wrong system had been installed in her house in January and that a different system needed to be installed.  The agent never mentioned that he was not affiliated with ADT.

77.     In May 2014, ADT customer J.C. in Hayward, California, reported to ADT that two Capital Connect sales agents told J.C. that his ADT equipment was outdated and would not work properly and needed to be upgraded.  The Capital Connect sales agents also falsely told J.C. that the city sent out a memo stating that all outdated equipment needed to upgraded.  The Capital Connect agents informed J.C. that ADT would charge him from the upgrade, but Capital Connect would do it for free.

78.     In July 2014, ADT customer A.M. reported to ADT that John Lee from Capital Connect came to her home in Stockton, California, and informed her that ADT is going out of business.  He removed her keypad from her security system.  A.M. reported to ADT that Lee had A.M. cancel her service with ADT and execute a new contract, even though the customer did not want to have her service cancelled with ADT.  A.M. later canceled her contract with Capital Connect.

79.     In January 2015, ADT customer G.C. in Fort Worth, Texas, reported to ADT that a Capital Connect salesperson named "Darren" came to the ADT customer's door claiming that ADT had sold her alarm account to Capital Connect.  The Capital Connect salesperson replaced G.C.'s equipment and converted G.C. into a customer of a competitor of ADT.

80.     In January 2015, ADT customer K.J. in Grand Prairie, Texas, reported to ADT that Capital Connect representative John Backus told K.J. that his alarm was "old" and "outdated" and that J.C.'s hardwired telephone system would not work in 2015.  Backus offered to install new equipment to keep the customer's system working.

81.     In February 2015, Capital Connect representative John Lee visited 77-year-old ADT customer Julio Rivera's home in Orlando, Florida.  Lee told Mr. Rivera that he was "with ADT" and needed to change the battery to Mr. Rivera's keypad.  Lee also told Mr. Rivera that

ADT did not have a direct connection to 911 and that the response time would take at least thirty minutes; whereas Capital Connect could provide an immediate response. After Mr. Rivera agreed to an "upgrade" of his equipment, Lee had Mr. Rivera execute a contract and scheduled installation. Mr. Rivera did not realize that he had switched monitoring companies until after the equipment was installed and the technician told him to call ADT to cancel his contract.

82.     In March 2015, a Capital Connect sales agent told ADT customer P.H. in Tampa, Florida, that Capital Connect was taking over for ADT in the customer's area.  P.H. reported to ADT that the representative had all of the customer's information.  Believing the representative was from ADT, the customer executed a contract with Capital Connect and had new equipment installed.

83.     Capital Connect's false and misleading statements and misuse of ADT's trade name have had a material effect on ADT customers' purchasing decisions, interfered with ADT's contractual relationships with its customers, deceived or had the capacity to deceive customers, induced ADT customers to break their contracts and enter into new customer contracts with competitors of ADT, and have caused and continue to cause injury to ADT.

84.     Upon information and belief, Capital Connect continues to make false and misleading statements, including misuse of the ADT trademark, to solicit ADT customers, to induce them to breach or otherwise terminate their agreements with ADT, and to enter into new customer contracts with ADT's competitors.

85.     As a direct and proximate result of Capital Connect's actions, ADT has suffered and will continue to suffer, irreparable harm and injury, and has suffered and will continue to suffer economic damages.

**Power Home Wrongfully Induces ADT Customers to Change Service**

86.     Power Home is another dealer in the alarm systems market.  Like Capital Connect, Power Home sells alarm systems in door-to-door sales calls, installs the alarm systems, and then sells the customer contracts to Monitronics.

87.     From 2013 to the present, ADT has received over 80 complaints from customers who report false sales pitches by Power Home's sales agents.  Some of these complaints are described below.

88.     Power Home representatives made false and misleading statements to ADT customers that the Power Home representatives were representatives of, employed by, or otherwise directly associated with ADT or the manufacturer of the customers' alarm systems being monitored by ADT.  Power Home often made these false and misleading statements under the pretext that they were providing the ADT customer with an "upgrade."  These and other false and misleading statements by Power Home representatives led the ADT customers to believe they were talking with representatives of ADT or with the manufacturer of their ADT alarm equipment.

89.     For example, in May 2013, ADT customer Donicia Bacon in Fayetteville, North Carolina, received a phone call from a person who identified himself as "Chris from PHT" and that "PHT" stands for "Power Home Technologies."  Chris told Ms. Bacon that he was aware that her ADT contract was up and that she was due to renew her contract.  He stated that if Ms. Bacon did not renew her contract, her monthly monitoring fee would increase.  Chris stated that he was from a local company monitoring on behalf of ADT and that ADT contracts with PHT, but PHT had its own policies.  The customer rejected Chris's offer and received two subsequent calls from Chris.

90.     In July 2013, 91-year-old ADT customer Ruth Bjurberg in Fort Lauderdale, Florida, reported to ADT that a man identifying himself as "Pablo from Power Home Technologies" told Ms. Bjurberg that he was aware that she was having issues with her ADT alarm system and that he was there to change her alarm.  Pablo told Ms. Bjurberg that Power Home is an ADT authorized dealer.  Based on Pablo's representations, Ms. Bjurberg allowed Pablo into her home to change her alarm system, and Pablo had Ms. Bjurberg execute a new contract.  It was not until Ms. Bjurberg noticed that her checking account was debited twice for monitoring services – one from ADT and another from Power Home – that she realized that Power Home was not an ADT dealer.  Ms. Bjurberg called Power Home to cancel her contract; however, a Power Home representative informed Ms. Bjurberg that she would have to pay an early termination fee to cancel her contract.  Ms. Bjurberg then called ADT to cancel her contract with ADT because she could not afford to pay the Power Home early termination fee.

91.     In August 2013, ADT customers D.S. and L.S. in Garden City, Georgia, reported to ADT that Power Home sales agents came to their door stating that ADT sent them to upgrade their outdated system.  The sales agents had paperwork with the ADT logo in the upper corner so D.S. and L.S. believed the sales agents were actually affiliated with ADT.  When D.S. and L.S.'s son-in-law stopped by their house, they realized that the sales agents were not associated with ADT and called the police.

92.     In June 2014, ADT customer N.B. in Houston, Texas, reported to ADT that a Power Home sales agent called the customer stating that he was "with GE" and that if she agreed to let him upgrade her security system, then ADT would reduce her monthly monitoring rate by ten to forty percent.

93.     Also in June 2014, two other ADT customers, C.R. and E.T., located around Houston, Texas, each reported to ADT that a Power Home representative called the customers stating that he was "with GE" and wanted to upgrade their security systems.

94.     In August 2014, ADT customer Candace Vaughan in Summerville, South Carolina, reported to ADT that a Power Home representative by the name of Brett Hall told Ms. Vaughan that he was a representative of a local ADT dealer and that he was in the neighborhood servicing ADT customers.  Mr. Hall told Ms. Vaughan that he could "upgrade" her ADT keypad to wireless.  Ms. Vaughan informed Mr. Hall that she needed to speak with her husband, and Mr. Hall left her home.

95.     In March 2015, ADT customer in Hephizibah, Georgia, K.D., reported to ADT that a Power Home representative named Jack Meyers came to her door stating that he came on behalf of GE to upgrade her security equipment. When K.D. asked Mr. Meyers what the relationship was between GE and ADT, Mr. Meyers stated that GE manufactures the key pad in her security equipment.  Mr. Meyers informed the customer that he could lower her rates for her monitoring services.   K.D. agreed to execute a contract to obtain the lower rate under the condition that everything else (including the provider of her monitoring services) would remain the same. A few days later, K.D. called ADT to confirm the date in which the new equipment would be installed.  ADT informed K.D. that no appointment was scheduled.  K.D. then called Power Home and learned that Power Home was not affiliated with ADT and that Monitronics would be the new monitoring provider if the new equipment was installed in her home.  K.D. cancelled the installation appointment because she wanted to stay with ADT.

96.     In April 2015, ADT customer Wendy Cato in Hephizibah, Georgia reported to ADT that Jack Meyers, a Power Home representative, came to her house stating that he was a

field manager for ADT and that he was aware that a battery had been installed in her security system the day before (which was true). Mr. Meyers said that the customer's system was seven years old and offered to provide a free upgrade. The customer stated that she needed to check with her husband first. When Mr. Meyers spoke with her husband on the phone, Mr. Meyers again represented that was with ADT, and the husband agreed to a free upgrade. That same day, Mr. Meyers asked the customer how much she paid ADT. When the customer stated that she did not know, Mr. Meyers proceeded to call ADT pretending to be the customer's husband in order to find out the amount. Believing that Mr. Meyers was the customer's husband, the ADT representative told Mr. Meyers the monthly amount, and Mr. Meyers offered to cut that amount by $10 a month. Mr. Meyers had the ADT customer execute some paperwork and scheduled installation of the new equipment. During the installation, the technician told the customer not to forget to cancel with ADT to avoid having two bills for monitoring services. The customer then realized she had misunderstood Mr. Meyers' affiliation and cancelled her Power Home contract.

97.      In May 2015, 77-year-old ADT customer Kay Thomas in Waynesboro, Georgia, reported that Jack Meyers, a Power Home representative, knocked on her door stating that he was from GE and was there to upgrade her system. He had the customer sign paperwork and requested a check for $40.99. When the customer made the check out to ADT, Mr. Meyers accepted the check without asking the customer to change the payee. In fact, Mr. Meyers never disclosed that Power Homes is not affiliated with ADT during his initial meeting with the ADT customer. A technician later came to the customer's house to install the new equipment. It was not until after the equipment was installed that the customer realized she executed a new contract with Power Home – not ADT. When she called Mr. Meyers to cancel the contract with Power Home, Mr. Meyers initially told her that it would cost $1,800 to remove the equipment. The

ADT customer refused to pay that amount. The next day, Mr. Meyers told the customer that a technician would remove the equipment free of charge, and the customer arranged for ADT to reinstall its equipment in her home.

98.     Representatives of Power Home also made false and misleading representations about ADT's business and its monitoring services for alarm accounts.

99.     In March 2014, the mother of an ADT customer, 82-year-old Lera Worrell in Guyton, Georgia, reported to ADT that Jack Myers from Power Home came to the ADT customer's door stating that he was there to "update" the customer's ADT alarm equipment. He told Ms. Worrell that Power Home had "bought out" ADT and that Power Home was "updating" all the ADT alarm equipment. Ms. Worrell allowed Mr. Myers into the customer's home, and he proceeded to inspect the customer's ADT alarm panel. During that time, Ms. Worrell's son-in-law came home and rejected Mr. Myers' offer to "update" the ADT alarm system.

100.    In June 2014, ADT customer M.S. in Tupelo, Mississippi, reported to ADT that she had been receiving phone calls from a Power Home representative stating that they were with "GE" and that "GE" bought out ADT. The representative told the customer that her security system needed to be upgraded as a result.

101.    In July 2014, ADT customer P.J. in Chattanooga, Tennessee, reported to ADT that a representative from Power Home told her that ADT no longer had a dealer in the area to service her security system and that Power Home would be taking over for ADT. The Power Home representative offered to upgrade her system and had the ADT customer execute a contract. The Power Home representative told her that he would cancel her account with ADT.

102.    These false sales pitches had a material effect on ADT customers' purchasing decisions, interfered with ADT's contractual relationships with its customers, confused or had

the capacity to confuse customers, induced ADT customers to break their contracts and enter into new customer contracts with competitors of ADT, and have caused and continue to cause injury to ADT.

103.    Upon information and belief, Power Home continues to use false pitches to solicit ADT customers, to induce them to breach or otherwise terminate their agreements with ADT, and to enter into new customer contracts with ADT's competitors.

104.    As a direct and proximate result of Power Home's actions, ADT has suffered and will continue to suffer irreparable harm and injury, and has suffered and will continue to suffer economic damages.

### Security Investments Wrongfully Induces ADT Customers to Change Service

105.    Security Investments is another dealer in the alarm systems market.  Security Investments also sells alarm systems, installs the alarm systems, and then sells the customer contracts to Monitronics.

106.    From 2013 to the present, ADT has received over fifty complaints from customers who have encountered Security Investments' false pitches.  Some of these complaints are described below.

107.    Security Investments representatives made false and misleading statements to ADT customers that the Security Investments representatives were representatives of, employed by, or otherwise directly associated with ADT or the manufacturer of the customers' alarm systems being monitored by ADT.  Security Investments often made these false and misleading statements under the pretext that they were providing the ADT customer with an "upgrade." These and other false and misleading statements by Security Investments representatives led the ADT customers to believe they were talking with representatives of ADT or with the manufacturer of their ADT alarm equipment.

COMPLAINT – PAGE 24

108.    For example, in May 2014, ADT customer Adolph Kraker in Roanoke, Virginia, reported to ADT that he received a phone call from a person identifying himself as Jerry Pfeister from ADT.  Mr. Pfeister offered to upgrade Mr. Kraker's ADT equipment for free.  When Mr. Kraker asked Mr. Pfeister if he worked for ADT, Mr. Pfeister stated that he worked for GE, the manufacturer of the customer's ADT equipment.  The customer agreed to an "upgrade," and Mr. Pfeister put the customer on hold.  Mr. Pfeister came back to the phone and told the customer that he did not have any representatives in the area who could perform the installation.  Mr. Pfeister gave Mr. Kraker a phone number to reach him and told Mr. Kraker that he would follow up.  The phone number that Mr. Pfeister gave Mr. Kraker is a phone number affiliated with Security Investments.

109.    In June 2014, ADT customer Deborah Holmes in Columbus, Ohio, reported to ADT that a person named Chris Pellington, who is a representative for Security Investments, knocked on her door stating that he was there to "upgrade" Ms. Holmes' ADT equipment.  The customer allowed Mr. Pellington into her home after he showed her a badge that had "ADT" and his name on it.  Mr. Pellington told Ms. Holmes that ADT was changing their system to wireless and that she would eventually be required to upgrade her equipment.  According to Mr. Pellington, Ms. Holmes would be charged for installation if she decided to wait to upgrade her equipment.  Mr. Pellington told the customer that the person installing the equipment would be from Honeywell, which is the manufacturer of ADT equipment.  He also told Ms. Holmes that she needed to change to a wireless system because people are able to cut the wires to her current ADT alarm, which would prevent Ms. Holmes from obtaining help.  Ms. Holmes eventually told Mr. Pellington that she needed to think it over.  Mr. Pellington gave her a card identifying him as "Director of Marketing" for an ADT dealer.  The customer later called ADT to determine

whether Mr. Pellington was an ADT representative, and learned that Mr. Pellington was not associated with ADT.

110.    In July 2014, ADT customer I.M. in Columbus, Ohio, reported to ADT that Security Investments sales agents told the customer that they were with ADT and needed to make some changes to the customer's account. After the system was installed, the customer realized that the sales agents were not with ADT and attempted to cancel his contract with Security Investments.

111.    In August 2014, ADT customer R.W. in Dublin, Ohio, reported to ADT that a Power Home representative called the customer stating that ADT wanted to come to his house to provide the customer with a free upgrade.  When the representative arrived, the representative had papers with the ADT logo on them.

112.    Representatives of Security Investments also made false and misleading representations about ADT's business and its monitoring services for alarm accounts.

113.    For example, in July 2013, ADT customer D.A. in Springfield, Ohio, reported to ADT that a Security Investments representative came to the customer's house and told the customer "ADT is having a hard time keeping people, so I'm a subcontractor to help them out." The representative explained that he was updating alarm systems to make them work better. D.A. agreed to have new equipment installed in D.A.'s home.

114.    In September 2013, ADT customer K.S. in New Philadelphia, Ohio, reported to ADT that a Security Investments sales agent approached the customer at home and told the customer that ADT was no longer servicing her area and the representative's company was taking over all the contracts.

115.    Security Investments' use of these false sales pitches had a material effect on ADT customers' purchasing decisions, interfered with ADT's contractual relationships with its customers, deceived or had the capacity to deceive customers, induced ADT customers to break their contracts and enter into new customer contracts with competitors of ADT, and have caused and continue to cause injury to ADT.

116.    Upon information and belief, Security Investments continues to make false and misleading statements, including misuse of the ADT trademark, to solicit ADT customers, to induce them to breach or otherwise terminate their agreements with ADT, and to enter into new customer contracts with ADT's competitors.

117.    As a direct and proximate result of Security Investments' actions, ADT has suffered and will continue to suffer irreparable harm and injury, and has suffered and will continue to suffer economic damages.

### Alliance Security Wrongfully Induces ADT Customers to Change Service

118.    Alliance Security is another dealer in the alarm systems market.   Alliance Security also sells alarm systems in door-to-door sales calls, installs the alarm systems, and then sells the customer contracts to Monitronics.

119.    From 2013 to the present, ADT has received over thirty complaints from customers who have reported the use of false sales pitches by Alliance Security's agents.  Some of these complaints are described below.

120.    Alliance Security representatives made false and misleading statements to ADT customers that the Alliance Security representatives were representatives of, employed by, or otherwise directly associated with ADT or the manufacturer of the customers' alarm systems being monitored by ADT.  Alliance Security often made these false and misleading statements under the pretext that they were providing the ADT customer with an "upgrade" or that they

COMPLAINT – PAGE 27

were performing "maintenance" of the security system. These and other false and misleading statements by Security Investments representatives led the ADT customers to believe they were talking with representatives of ADT or with the manufacturer of ADT's alarm equipment.

121. For example, in August 2013, ADT customer T.B. in Scarborough, Canada, reported to ADT that an Alliance Security representative called the customer and stated that the representative was with ADT and wanted to "update" the customer's equipment. Soon thereafter, a technician came to the customer's house and removed the customer's ADT equipment and installed an Alliance Security system.

122. In January 2015, ADT customer Patricia Belcher-Wuchte in Fort Pierce, Florida, reported to ADT that an Alliance Security representative by the name of Kristen came to the customer's door stating, "I see you have ADT; we are here to upgrade your equipment." Another representative by the name of Bryan was also present. Bryan stated that he was with Alliance Security and at the customer's home to "upgrade" her equipment. The customer reported to ADT that she was under the impression that the representatives were with ADT but that ADT changed its name to Alliance. Based on these misrepresentations, the customer executed a contract with the Alliance Security representatives and had new equipment installed in her home.

123. In February 2015, ADT customer R.W. in Lubbock, Texas, reported to ADT that a man named Ricky knocked on the customer's door and stated that he was "with ADT." Ricky said that he needed to speak with the customer about some changes and gave the customer a business card that identified him as a representative of Alliance Security.

124. In April 2015, ADT customer L.J. in Chicago, Illinois, reported to ADT that an Alliance Security agent spoke with the customer's elderly father, claimed to be with ADT, and

claimed to be visiting to "upgrade" the customer's security system.  By the time the customer got home, Alliance Security technicians were already installing new Alliance Security equipment.

125.    Representatives of Alliance Security also made false and misleading representations about ADT's business and its monitoring services for alarm accounts.

126.    For example, in March 2013, ADT customer M.K. in Baker, Louisiana, reported to ADT that an alarm company representative called the customer and stated that the representative's company "bought out" ADT and could offer her a better price because the company owned ADT.  When the customer asked how the representative had her phone number, the representative falsely stated that the company obtained all of ADT's customer information when it bought ADT.  The phone number from which the representative called belonged to Alliance Security.

127.    In April 2014, ADT customer O.T. in Huntsville, Texas, reported to ADT that Alliance Security representative told the customer that she had service for five years and that he could give her a lower rate and more equipment.  The customer reported to ADT that she was led to believe that she was no longer under contract with ADT and proceeded to enter into a contract with Alliance Security.  The customer, in fact, still had a contract with ADT and, as a result of the representative's misrepresentations, had two contracts for monitoring services.

128.    In December 2014, ADT customer G.B. in Sun City, Arizona, reported to ADT that an Alliance Security representative who identified himself as Paul came to the customer's door and stated that Alliance Security had bought ADT.  The representative had G.B. sign a new contract and replaced G.B.'s ADT system with an Alliance Security system.

129.    In January 2015, 66-year-old ADT customer Phyllis Conlon in Maricopa, Arizona, reported to ADT that a person identifying himself as Paul Cheesman came to the

customer's door wearing an Alliance Security badge.  Mr. Cheesman told Ms. Conlon that "we are upgrading" systems to digital and that people in the neighborhood are cutting phone lines so he was "making sure people are protected."  He also told Ms. Conlon that Alliance Security "bought out" ADT.  Mr. Cheesman had Ms. Conlon execute a contract. Later that day, an Alliance Security technician installed the new equipment in the customer's home.  When the customer's husband asked the technician for an additional yard sign, the technician gave the customer an ADT yard sign.  Ms. Conlon eventually called ADT to confirm whether Alliance Security bought out ADT.  ADT informed Ms. Conlon that Alliance Security had not bought out ADT.  Ms. Conlon canceled her contract with Alliance Security and arranged to have ADT equipment re-installed in her home.

130.   Also in January 2015, 86-year-old ADT customer Phyllis Rowe in Phoenix, Arizona, reported to ADT that a person identifying himself as Paul Cheesman told Ms. Rowe that ADT was sold to his company, Alliance Security, and that he needed to make some changes to her alarm system.  Based on Mr. Cheesman's representations, Ms. Rowe let Mr. Cheesman into her home.  Mr. Cheesman told Ms. Rowe that she needed a new alarm system and made arrangements for installation.  Within minutes, an Alliance Security technician arrived at Ms. Rowe's home and installed the new equipment.  Mr. Cheesman had Ms. Rowe execute a contract and write him a check.  The next day, Ms. Rowe confirmed with ADT that ADT had not been sold to Alliance Security and called Alliance Security to cancel her contract.  She made arrangements for ADT to reinstall its equipment in her home.

131.   Also in January 2015, Kathy Wockley, an ADT customer in Port Saint Lucie, Florida, reported to ADT that a woman wearing an Alliance Security badge approached her stating that ADT had a bad rating with the Better Business Bureau and that Alliance Security was

going door-to-door to all ADT customers to change their ADT alarm systems. The representative offered to give the customer free alarm equipment. The customer declined the representative's offer.

132.    Alliance Security's use of these false pitches had a material effect on ADT customers' purchasing decisions, interfered with ADT's contractual relationships with its customers, deceived or had the capacity to deceive customers, induced ADT customers to break their contracts and enter into new customer contracts with competitors of ADT, and have caused and continue to cause injury to ADT.

133.    Upon information and belief, Alliance Security continues to make false and misleading statements, including misuse of the ADT trademark, to solicit ADT customers, to induce them to breach or otherwise terminate their agreements with ADT, and to enter into new customer contracts with ADT's competitors.

134.    As a direct and proximate result of Alliance Security's actions, ADT has suffered and will continue to suffer, irreparable harm and injury, and has suffered and will continue to suffer economic damages.

### Maximum Security Wrongfully Induces ADT Customers to Change Service

135.    Maximum Security is another dealer in the alarm systems market. Alliance Security also sells alarm systems, installs the alarm systems, and then sells the customer contracts to Monitronics.

136.    From 2013 to the present, ADT has received over twenty-five complaints from customers who have encountered Maximum Security's false pitches. Some of these complaints are described below.

137.    In an effort to stop Maximum Security's use of false and misleading statements, ADT sent cease and desist letters to Maximum Security on August 21, 2014, and June 19, 2015. Maximum Security has disregarded these letters.

138.    Upon information and belief, Maximum Security representatives have been using the ADT trade name to take over ADT alarm accounts and to sell those accounts to Monitronics.

139.    In its sales calls, Maximum Security's sales agents have used false sales pitches with ADT's customers, claiming to be representatives of, employed by, or otherwise directly associated with ADT or the manufacturer of the customers' ADT alarm systems.  Maximum Security's agents often made these false and misleading statements under the pretext that they were providing an "upgrade".  These statements led ADT's customers to believe they were talking with representatives of ADT or with the manufacturer of ADT's alarm equipment.

140.    In May 2014, ADT customer F.E. in Palmdale, California, reported to ADT that a representative of an alarm company called the customer and stated that the customer's contract was expired and that the customer needed an "upgrade".  The representative offered to provide the "upgrade" but did not mention his affiliation with Maximum Security.  A technician and a salesman later came to the customer's house and had the customer execute a new contract and installed new equipment in the customer's house.  The customer believed Maximum Security was an ADT dealer.

141.    In April 2014, ADT customer D.W. in Saint Louis, Missouri, reported to ADT that a Maximum Security representative came to the customer's door stating that they were "with ADT" and offered to give the customer an "upgraded" system.  Believing the representatives were ADT, the customer executed a new contract and had equipment installed.

142.    In July 2014, ADT customer S.S. in Gold Canyon, Arizona, reported to ADT that a person came to the customer's door wearing an ADT shirt stating that ADT was updating security systems.   The person gave the customer a business card identifying him as Oscar Covarrubias, a representative of Maximum Security.

143.    Representatives of Maximum Security also made false and misleading representations about ADT's business and its monitoring services for alarm accounts.

144.    For example, in August 2013, ADT customer G.M. in Sacramento, California, reported to ADT that a former employee of ADT named John who actually installed the customer's equipment in 2012 came to her home.  The former ADT employee told the customer that ADT merged with Maximum Security and that she needed to have her system "upgraded". The customer reported to ADT that she signed some documents not believing that it was a new contract with Maximum Security.

145.    In January 2015, ADT customer M.B. in Wiergate, Texas, reported to ADT that a Maximum Security representative called the customer stating that the customer's ADT system needed to be updated because it was "out of warranty," and that ADT would no longer respond to alarm signals from the customer's system.

146.    Also in January 2015, ADT customer L.F. in Lawrence, Indiana, reported to ADT that an alarm company representative called the customer and offered to "upgrade" the customer's system and reduce her monitoring rates. When the customer asked the representative how he had her information, the person stated that ADT provided the information regarding her account.  The phone number from which the representative called belongs to Maximum Security.

147.    Maximum Security's use of these false sales pitches had a material effect on ADT customers' purchasing decisions, interfered with ADT's contractual relationships with its

customers, deceived or had the capacity to deceive customers, induced ADT customers to break their contracts and enter into new customer contracts with competitors of ADT, and have caused and continue to cause injury to ADT.

148.    Upon information and belief, Maximum Security continues to make false and misleading statements, including misuse of the ADT trademark, to solicit ADT customers, to induce them to breach or otherwise terminate their agreements with ADT, and to enter into new customer contracts with ADT's competitors.

149.    As a direct and proximate result of Maximum Security's actions, ADT has suffered and will continue to suffer, irreparable harm and injury, and has suffered and will continue to suffer economic damages.

150.    Not all of the customers affected by Defendants' agents' use of false sales pitches report misconduct to ADT.  As a result, the complaints ADT has received are likely a small fraction of the total number of customers to whom Defendants, by their agents, marketed alarm systems using false pitches.

151.    Defendants' use of these pitches, with the likely confusion they cause customers as to the affiliation of the Defendants' services with ADT, has confused the market for ADT's services, capitalized on ADT's goodwill among consumers, preyed on consumers' trust in ADT, and allowed them to acquire customers who believed they were dealing with ADT.

152.    Defendants' false sales pitches has injured ADT's reputation and relationship with its customers.

## COUNT I
## UNFAIR COMPETITION IN VIOLATION
## OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

153.    Plaintiffs incorporate Paragraphs 1 through 151, as if set forth fully here

154.    ADT US Holdings owns the ADT Trademarks. ADT LLC uses the ADT Trademarks under license from ADT US Holdings. Both are injured by any infringement of the ADT Trademarks.

155.    Defendants misrepresent themselves to ADT customers as technicians or agents of companies affiliated with ADT, visiting the customers to provide an "upgrade" of the customers' ADT alarm systems, and use other false sales pitches that are intended to mislead ADT customers as to the Defendants' true affiliation.

156.    In fact, Defendants' sales agents do not represent ADT. They use these false sales pitches to sell alarm systems to ADT customers without the customers' knowledge.

157.    These false and misleading statements are likely to confuse consumers regarding Defendants' affiliation with ADT.   Defendants already have created confusion among consumers, and will continue to do so if permitted to continue.

158.    Each of the Defendants has used these false sales pitches to sell alarm systems to ADT customers.

159.    ADT has been and will continue to be damaged as a result of Defendants' false statements, by the confusion of the market for ADT's goods and services, by the disruption of ADT's relationships with its customers, by the diversion of ADT's customers to defendants, and by damage to ADT's goodwill and reputation as a reliable provider of security systems.

160.    ADT is entitled to an injunction pursuant to 15 U.S.C. § 1116(a) barring defendants from further violations of 15 U.S.C. § 1125(a). Defendants are likely to continue to engage in such practices unless they are enjoined by this Court from further violations.

161.    ADT is entitled to an award of compensatory damages, as well as Defendants' profits, and attorney fees and the costs of this action pursuant to 15 U.S.C. § 1117(a). The Court,

pursuant the discretion confided to it under this section of the Lanham Act, should consider trebling these damages to compensate ADT fully for its losses.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

a.   An order pursuant to 15 U.S.C. § 1116(a) restraining and enjoining Defendants and their respective agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales agents to state or represent, that:

1.   their agents are visiting from "the alarm company" or "the security company" without also specifying defendants' name in the same sentence;

2.   ADT is going out of business or is in financial difficulty;

3.   ADT does not exist;

4.   ADT is changing or has changed its company name;

5.   Defendants have acquired, have merged with, have been taken over by, or are part of ADT;

6.   Defendants are acting on behalf of, or are otherwise acting with the consent or approval of ADT;

7.   Defendants are the "sister" companies of ADT or in any other way affiliated with ADT;

8.   Defendants manufacture the equipment used by ADT, or that defendants represent or are visiting on behalf of an alarm equipment manufacturer, including but not limited to General Electric and Honeywell;

9.   Defendants are performing routine maintenance on the customer's ADT's equipment;

10. any change proposed during a sales solicitation is an "update" or "upgrade" of the consumer's existing alarm system or alarm monitoring service agreement with ADT;

11. an ADT customer's ADT security system is outdated or deficient;

12. any enjoined party is "taking over' the monitoring of an ADT account or has purchased an ADT account from ADT;

13. ADT is not, or has stopped, monitoring the alarm system for that person, residence, or business;

14. ADT will no longer be able to monitor or service the alarm system for that person, residence, or business;

15. any enjoined party is affiliated with, has the endorsement of, or is in any manner acting at the direction of any governmental or law enforcement agency without the prior approval of such governmental or law enforcement agency;

16. statistics or other information is accurate which is known to be false or misleading, and which defendants have not made a reasonable effort to objectively quantify or substantiate; or

17. any other false or misleading representation to current or former customers of ADT in the marketing or sale of an alarm system that defendants' sales agent knows to be false when made.

b.      Compensatory damages, in an amount to be found by the jury at trial of this cause, but believed to be no less than $7,000,000;

c.      An award of defendants' profits resulting from their deceptive practices to ADT;

d.      Attorney fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

e.      Such other and further relief as the Court may deem appropriate.

## COUNT II
## UNFAIR COMPETITION

162.    Plaintiffs incorporate Paragraphs 1 through 151, as if set forth fully here

163.    ADT and Defendants compete for a common pool of customers. ADT and Defendants market alarm services to the same target market of residential customers.

164.    Defendants' use of false sales pitches that confuse customers as to Defendants' affiliation, and as to the source of their services, violates numerous provisions of the Texas deceptive trade practices statute, V.T.C.A., Bus. & C. § 17.46(a), including (without limitation) the prohibited conduct set forth in subsections 1, 2, 3, 5, 8, 13, 17 and 24 of Section 1746(b).

165.     Defendants' use of false sales pitches that confuse customers as to Defendants' affiliation, and as to the source of their services, also violates the Texas deceptive advertising statute, V.T.C.A., Bus. & C. § 17.12(a).

166.    Defendants' use of false sales pitches that confuse customers as to Defendants' affiliation, and as to the source of their services, has also caused ADT customers to cancel their ADT alarm services under false pretenses, and therefore constitutes a tort of wrongful interference with ADT's contractual relations with its customers.

167.    Defendants, by violating the Texas statutes, and by committing torts cognizable under the Texas common law, are competing unfairly with ADT, and by their use of false sales pitches are misleading ADT's customers to accept what they believe to be an "upgrade" of their

existing ADT alarm services, when in fact they are visiting ADT's customers to sell and install a competing non-ADT alarm system.

168.    Defendants' conduct in using false sales pitches is contrary to honest practice in industrial or commercial matters, as are the false pitches themselves.

169.    Defendants' actions are likely to cause confusion among consumers, and have already caused confusion.

170.    ADT has been injured as a result of Defendants' actions.

171.    ADT is entitled to injunctive relief pursuant to common law for Defendants' ongoing marketing activities. Given the ongoing nature of Defendants' misconduct, Defendants are likely to continue to engage in such practices unless this Court takes appropriate measures to enjoin further violations.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

a.    An order restraining and enjoining defendants and their respective agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales agents to state or represent, that:

1.    their agents are visiting from "the alarm company" or "the security company" without also specifying defendants' name in the same sentence;

2.    ADT is going out of business or is in financial difficulty;

3.    ADT does not exist;

4.    ADT is changing or has changed its company name;

5.    Defendants have acquired, have merged with, have been taken over by, or are part of ADT;

6.   Defendants are acting on behalf of, or are otherwise acting with the consent or approval of ADT;

7.   Defendants are the "sister" companies of ADT or in any other way affiliated with ADT;

8.   Defendants manufacture the equipment used by ADT, or that defendants represent or are visiting on behalf of an alarm equipment manufacturer, including but not limited to General Electric and Honeywell;

9.   Defendants are performing routine maintenance on the customer's ADT's equipment;

10. any change proposed during a sales solicitation is an "update" or "upgrade" of the consumer's existing alarm system or alarm monitoring service agreement with ADT;

11. an ADT customer's ADT security system is outdated or deficient;

12. any enjoined party is "taking over' the monitoring of an ADT account or has purchased an ADT account from ADT;

13. ADT is not, or has stopped, monitoring the alarm system for that person, residence, or business;

14. ADT will no longer be able to monitor or service the alarm system for that person, residence, or business;

15. any enjoined party is affiliated with, has the endorsement of, or is in any manner acting at the direction of any governmental or law enforcement agency without the prior approval of such governmental or law enforcement agency;

16. statistics or other information is accurate which is known to be false or misleading, and which defendants have not made a reasonable effort to objectively quantify or substantiate; or

17. any other false or misleading representation to current or former customers of ADT in the marketing or sale of an alarm system that defendants' sales agent knows to be false when made.

b.      Compensatory damages, in an amount to be found by the jury at trial of this cause, but believed to be no less than $7,000,000;

c.      Punitive damages in a sum sufficient to deter defendants from engaging further in such sales practices; and

d.      Such other and further relief as the Court may deem appropriate in the circumstances.

Dated: July 7, 2015

Respectfully submitted,

KANE RUSSELL COLEMAN & LOGAN PC

By: /s/ Robert N. LeMay
Robert N. LeMay
State Bar No. 12188750
rlemay@krcl.com
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas  75201
Tel: (214) 777-4200
Fax: (214) 777-4299

C. Sanders McNew
Florida Bar No. 90561
McNew P.A.
2385 NW executive Drive, Suite 100
Boca Raton, Florida 33431
mcnew@mcnew.net
TelephoneL 561.299.0257
(Pro Hac Vice Pending)

Richard  G. Sander
Colorado Bar No. 12504
RSander@shb.com
Kali Backer
Colorado Bar No. 45436
kbacker@shb.com
Shook Hardy & Bacon, LLP
1660 17th Street, Suite 450
Denver, CO 80202
Telephone: 303.285.5300
Facsimile: 303.285.5031
(Pro Hac Vice Pending)

Aaron Kirkland
Missouri Bar No. 60842
Shook Hardy & Bacon, LLP
2555 Grand Blvd.
Kansas City, MO 64108
T: 816.474.6550
F: 816.421.5547
akirkland@shb.com
(Pro Hac Vice Pending)

**ATTORNEYS FOR PLAINTIFFS**