UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ADT, LLC, ET AL.,                           )
                                            )
                Plaintiffs,                 )
                                            )          CIVIL ACTION NO.
VS.                                         )
                                            )          3:15-CV-2252-G
CAPITAL CONNECT, INC., ET AL.,              )
                                            )
                Defendants.                 )

## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the plaintiffs, ADT LLC and ADT US

Holdings, Inc. (together "ADT"), for a preliminary injunction.  For the reasons stated

below, the plaintiffs' motion is granted.

## I.  BACKGROUND

### A.  Factual Background

ADT provides electronic security services and equipment to homes and

businesses throughout the United States.  ADT's Motion for Preliminary Injunction

("Motion") at 3 (docket entry 4).  ADT has been providing alarm services for over a

century and today provides monitoring services for nearly one quarter of American

homes equipped with alarm systems.  *Id.*  In this case, ADT has sued Capital

Connect, four other alarm-service sale companies, and five individual alarm-service

sales persons.  Complaint ("Complaint") (docket entry 1).  ADT alleges that Capital

Connect and the other defendants sell alarm systems in unannounced door-to-door

sales visits, during which the defendants "confuse the homeowners into believing that

the defendants are somehow affiliated with ADT."  Motion at 1-2.  ADT contends

that the defendants' sales tactics violate Section 43(a) of the Lanham Act, 15 U.S.C.

§ 1125(a), and ADT's rights against unfair competition at common law.  *Id.*  ADT

seeks to enjoin Capital Connect "from continuing to use false sales pitches that are

likely to confuse customers as to Capital Connect's affiliation with ADT."  Motion at

1.

Capital Connect was established in 2008 in Tucson, Arizona.  It sells the

"latest technology in security, automation and interactive services."  Capital

Connect's Response to ADT's Motion for Preliminary Injunction ("Response") at 3

(docket entry 46) (citing docket entry 47, Appendix 002, Declaration of Todd

Johnson ¶ 3 ("Johnson Decl.")).  Capital Connect signs customers to long-term

contracts through "a substantial expansion of its independent contractor sales force,"

which operates in 10 states, including Texas.[1]  *Id.*  Capital Connect is a dealer for one

of ADT's rival security monitoring service companies, Monitronics International.

Johnson Decl. ¶ 3.  Capital Connect's sales force sells its services door-to-door with

---

[1]      Capital Connect labels its sales force as "independent contractors," while
ADT argues that Capital Connect's sales associates are employees.  This disagreement
is discussed below in Section II.C.1.e.  For consistency, the court will refer to Capital
Connect's sales group as the "sales force" or individually as "sales associates."

the aim of getting customers to sign up for its service to have Monitronics, not ADT, monitor the alarm equipment.[2]  *Id.* ¶¶ 3-5.  This case centers on the practices and behavior of Capital Connect's sales force during these door-to-door sales pitches.

ADT alleges that during Capital Connect's sales pitches, Capital Connect solicits ADT's current customers by "making false and deceptive statements that are intended to mislead (and are misleading) ADT's customers into believing that [Capital Connect] represent[s] ADT, or that ADT has exited the market, or that ADT's installed equipment is outdated and in need of an 'upgrade.'" Motion at 3. ADT offers 68 customer declarations to support its claim that Capital Connect's sales tactics confuse ADT's customers.  ADT's Sur-reply to Capital Connect's Sur-reply ("ADT's Sur-reply") at 5 (docket entry 77).  ADT's declarations, attached in support of its motion for preliminary injunction, cite interactions with Capital Connect's sales associates from 2013 to the present.  *See* ADT's Appendix in Support of Motion for Preliminary Injunction ("ADT's Appendix"), Exhibit 9, Declaration of Joan Homann ¶ 4 (July 11, 2013) (docket entry 7); ADT's Supplemental Appendix in Support of Motion for Preliminary Injunction ("ADT's Supp. Appendix"), Exhibit 3, Declaration of Cathy Brion ¶ 4 (June 16, 2015) (docket entry 17).  ADT's litigation manager, who is in charge of its customer complaint department, cites an acceleration during

---

[2]      "Neither ADT nor Monitronics makes alarm equipment.  Instead, a few companies such as GE Security, Honeywell, and 2GIG supply alarm panels and sensors to all sellers of alarm systems in the United States."  Complaint ¶ 22.

2015 in the number of customer complaints regarding interactions with Capital Connect.  ADT's Appendix, Exhibit 2, Declaration of Marcia Gold ("Gold Decl.") ¶ 5 (docket entry 7).  ("The overall numbers in 2015 have nearly tripled over the same five-month period from last year -- from 42 to 112 complaints.  More troubling is the recent surge in reported misconduct by Capital Connect sales agents:  50 reports of false sales pitches occurring in May 2015 alone . . . plus another 41 for the first three weeks of June 2015.").[3]  ADT cites the "rapid escalation" of customer complaints, and a fear that Capital Connect would increase its false sales tactics through hiring college students for the summer as strong evidence of the need for a preliminary injunction.[4]  Motion at 10-11; Gold Decl. ¶ 7.

The declarations recount a variety of Capital Connect's sales tactics, including but not limited to, claims that ADT has gone out of business (ADT's Third Supp.

---

[3]     A month and a half after ADT filed its motion for preliminary injunction, ADT reported that it "received 269 reports of false sales pitches by Capital Connect agents" in 2015 alone.  ADT's Third Supplemental Appendix in Support of its Motion for Preliminary Injunction ("ADT's Third Supp. Appendix"), Exhibit 1, Second Declaration of Marcia Gold ("Second Gold Decl.") ¶ 3 (docket entry 56).

[4]     Even though summer has ended, ADT has presented enough evidence of continuing use of illegal sales tactics to warrant a preliminary injunction.  ADT cited Capital Connect's hiring of college students and the fear of an even greater increase in the use of misleading sales practices as just one of the reasons for the need to enjoin Capital Connect's conduct.  *See* Motion at 9-20.

Appendix,[5] Exhibit 1EE, Appendix_000124-126, Declaration of Dolores Ruiz ¶ 5,

"Mr. Gatehouse stated that . . . ADT was 'going out of business.'"); claims that

Capital Connect has acquired ADT (Exhibit 1G, Appendix_000032-48, Declaration

of William Pearson ¶ 6, "Mr. Beasley stated that Capital Connect was taking over

ADT."); claims that Capital Connect is a contractor for ADT (Exhibit 1HH,

Appendix_000131-33, Declaration of Karen Juten ¶ 9, "When I asked the Capital

Connect representatives for their identification badges, they then stated they were

contractors for ADT."); claims that Capital Connect is affiliated with ADT in some

manner (Exhibit 1F, Appendix_000028-31, Declaration of Sidney Sims ¶ 6, "Capital

Connect is the manufacturer that made the equipment that ADT installed into my

home."); claims that ADT has left the local market (Exhibit 1G, Appendix_000032-

48, Declaration of William Pearson ¶ 6, "He said that ADT was moving out of

Florida and relocating to Colorado.  He said ADT was no longer servicing alarms in

Florida."); claims that ADT's equipment is susceptible to malfunction, or tampering

(Exhibit 1L, Appendix_000064-66, Declaration of Betty Schwieman ¶ 5, "ADT was

having problems with intruders cutting the phone lines and robbing homes."); claims

that the Capital Connect sales associate is at the home to "upgrade" or "update" its

alarm system (Exhibit 10, Appendix_000071-73, Declaration of Jose Aviles ¶ 6, "The

representative told me that Capital was an ADT affiliate there to upgrade my alarm

---

[5]        All declarations cited in this paragraph are located in ADT's Third Supp.
Appendix.

panel for free."); claims that customers would not be able to reach 911 in case of an emergency (Exhibit 1S, Appendix_000083-85, Declaration of Chandrell Larkin ¶ 10, "The representative told me the young kids in the area are going around cutting phone wires connected to the alarm system which would cut off any signals to ADT alerting ADT to contact emergency services on my behalf."); and claims that the sales associates were sent by ADT to check or replace ADT equipment (Exhibit 1HH, Appendix_000131-33, Declaration of Karen Juten ¶ 6, "Mr. Crosby stated that he was there to replace my ADT alarm system for free.").  *See also* ADT's Appendix; ADT's Supp. Appendix; ADT's Second Supplemental Appendix in Support of Motion for Preliminary Injunction ("ADT's Second Supp. Appendix") (docket entry 18); ADT's Third Supp. Appendix.

Capital Connect insists that it has adopted several measures "to ensure each interaction is professional and its reputation is well-regarded."  Johnson Decl. ¶¶ 7-14. Capital Connect's sales training manual warns sales associates of the harm a single damaging story on the local news covering its sales tactics could do to the company.[6]

---

[6]      In fact, there have been at least four local news stories covering Capital Connect's behavior in Florida and Texas.  Motion at 2 n.1 (citing Chris Bonanno, *Police Warn of Aggressive Solicitors in Rockledge, Cocoa*, FLORIDA TODAY (June 25, 2015), http://www.floridatoday.com/story/news/2015/06/23/police-warn-of-aggressive-solicitors-inrockledge-cocoa/29178225/ (last accessed Sept. 16, 2015); Vanessa Welch and Bob Opsahl, *Action 9 Investigates Home Alarm Hustle*, WFTV.COM (June 18, 2015), http://www.wftv.com/news/news/action-9-investigates-home-alarm-hustle/nmgQP/#__federated=1 (last accessed Sept. 16, 2015)), Second Gold Decl. ¶ 7 (citing Walt Maciborski, *Police Warn of Suspicious Solicitors in Austin and Round*

(continued...)

Response at 4 (citing App. 097). Capital Connect requires its sales force to agree to its "Code of Conduct, Sales Rules, and Sales Ethics Agreement," and dresses its sales force in Capital Connect labeled polo shirts, with photo identification cards labeling the sales associate as a representative from Capital Connect. *Id.* ¶ 8. Capital Connect's sales force must agree to Capital Connect's "Sales Rules," which prohibit the sales associates from engaging in inappropriate sales tactics, including a prohibition against "tell[ing] a potential customer that has an existing system with monitoring services that their existing alarm company (1) has been bought out/merged with Capital Connect, (2) is no longer monitoring their system, (3) has sent you to their home to upgrade their alarm . . .." App. 032 ("Exhibit D – Sales Rules," *attached to* Johnson Decl.). Furthermore, Capital Connect requires new customers who had a pre-existing alarm service agreement with ADT, or a different monitoring service, to sign an "Alarm Upgrade Agreement," which expressly disclaims any connection between Capital Connect and the current alarm monitoring company. Johnson Decl. ¶ 11. Lastly, Capital Connect engages in quality assurance calls, during which a Capital Connect representative asks the customer if he/she understands that

---

[6](...continued)
*Rock*, KEYETV NEWS (June 22, 2015), http://www.keyetv.com/news/features/top-stories/stories/police-warn-suspicious-solicitors-austin-round-rock-26601.shtml (last accessed Sept. 16, 2015); Evan Lambert, *Hernando Deputies Warn of Possible Predator Alarm Salesman*, FOX13 NEWS (July 13, 2015), http://www.fox13news.com/news/2082851-story  (last accessed Sept. 16, 2015)).

Capital Connect is not affiliated with ADT and that the customer has the responsibility to cancel his/her current contract with ADT.  *Id.* ¶ 10.

Despite these measures, ADT's customers have reported, and continue to report, to ADT that Capital Connect's sales force engages in the very behavior Capital Connect and the Lanham Act prohibit.  ADT alleges that it has received additional customer complaints of false sales tactics by Capital Connect's sales force:  70 complaints in June and 57 complaints in July, equaling 269 complaints in 2015.[7] Second Gold Decl. ¶ 3.  To prevent Capital Connect's sales force from continuing to engage in this prohibited behavior, ADT seek to preliminarily enjoin Capital Connect from continuing to "confuse ADT's customers in its marketing of alarm services." Motion at 11.

## B.  Procedural Background

ADT filed this suit against Capital Connect, as well as several other defendants,[8] in this court on July 7, 2015.  On the same day, ADT filed this motion

---

[7]     Citing academic studies, ADT argues that these complaints represent only a fraction of the instances in which Capital Connect has used these sales tactics because "fewer than five percent of customers takes the time to report such practices to ADT."  Motion at 9-10.  The court will not comment on the viability of this evidence to support a finding of likelihood of confusion, nor does it rely on this evidence to support its granting of ADT's motion for a preliminary injunction.

[8]     Power Home Technologies, LLC, Security Investments LLC, Alliance Security, Inc., Maximum Security Alarm, Inc., John Lee, John Backus, Victor Vega, Trevor McAlees, and Anthony Bonardi are the other defendants ADT has sued in this case.

for a preliminary injunction against Capital Connect seeking to prevent Capital Connect from engaging in the alleged "false sales pitches."  Motion at 1.  On July 10, 2015, ADT filed a motion for a temporary restraining order seeking to restrain Capital Connect from continuing the same underlying conduct.  Subsequently, Capital Connect filed a response contesting ADT's motions for a temporary restraining order and a preliminary injunction.  On August 13, 2015, this court denied ADT's motion for a temporary restraining order.  The parties have extensively briefed this motion for preliminary injunction, having each filed sur-replies after the initial motion by ADT, the response by Capital Connect, and the reply by ADT.[9]

## II.  ANALYSIS

### A.  Preliminary Injunction Standard

Under 15 U.S.C. § 1116(a), this court has "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark office."  *See also* FED. R. CIV. P. 65(a)(1).

To obtain a preliminary injunction, it is well established that a movant must show:  (1) a substantial likelihood that the movant will ultimately prevail on the

---

[9]    ADT's motion for preliminary injunction (July 7, 2015) (docket entry 4); Capital Connect's response to ADT's motion for preliminary injunction (August 7, 2015) (docket entry 46); ADT's reply in further support of the motion for preliminary injunction (August 19, 2015) (docket entry 55); Capital Connect's sur-reply (August 31, 2015) (docket entry 75); ADT's sur-reply in response to Capital Connect's sur-reply (September 2, 2015) (docket entry 77).

merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction will not disserve the public interest. *Paulsson Geophysical Services, Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008); *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

The decision to grant or deny a preliminary injunction is left to the sound discretion of the district court. *Mississippi Power & Light*, 760 F.2d at 621. A preliminary injunction is an extraordinary remedy which should only be granted if the movant has clearly carried his burden of persuasion on all four factors. *Id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (A preliminary injunction is a "drastic remedy" that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.") (citation omitted) (emphasis in original); *PCI Transportation, Inc. v. Fort Worth & Western Railroad Company*, 418 F.3d 535, 546 (5th Cir. 2005) ("[t]he plaintiff has the burden of introducing sufficient evidence to justify the grant of a preliminary injunction."). As a result, "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power &*

*Light*, 760 F.2d at 621; *House the Homeless, Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996).

## B. Evidentiary Matters

Before addressing the merits of ADT's motion for a preliminary injunction, the court turns to Capital Connect's arguments regarding the admissibility of evidence and whether Capital Connect has created a factual dispute necessitating a hearing on ADT's motion for a preliminary injunction.  Response at 8, 13; Capital Connect's Sur-reply at 1 (docket entry 75).

### 1. *Sufficiency of Declaration Evidence to Support a Motion for Preliminary Injunction*

Capital Connect first argues that the court should not give ADT's declarations credence because those declarations are riddled with hearsay.  Response at 8, 13 n.12 ("ADT's customer declarations are replete with hearsay about what they were supposedly told by a Capital Connect independent sales representative."); Capital Connect's Sur-reply at 1.

The law is well-settled that because the procedures governing a preliminary injunction are generally less formal than those at trial, the court may rely upon otherwise inadmissible evidence when considering a preliminary injunction. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Sierra Club, Lone Star*

*Chapter v. Federal Deposit Insurance Corporation*, 992 F.2d 545, 551 (5th Cir. 1993) ("at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence."); *Federal Savings & Loan Insurance Corporation v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (citing *Camenisch* for the proposition that "a preliminary injunction proceeding is not subject to jury trial procedures"); *Texas Commerce Bank National Association v. State of Florida*, No. 3:96-CV-2814-G, 1997 WL 181532, at *4 (N.D. Tex. Apr. 9, 1997) (Fish, J.) (in deciding whether to grant a preliminary injunction, "the court may rely on hearsay evidence and may even give inadmissible evidence some weight"), *aff'd*, 138 F.3d 179 (5th Cir. 1998).

Contrary to Capital Connect's assertion, most of the declarants' out-of-court statements do not appear to be hearsay.  The declarations attached to ADT's filings include the customers' out of court statements to show the customers' state of mind, an exception to the rule against hearsay.  Fed. R. Evid. 803(3); *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1160 n.10 (5th Cir. 1982); *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 847 (N.D. Tex. 2009) (Fish, J.).  Additionally, most of the declarants cite Capital Connect's sales associates'[10] out of court statements not for the truth of the matter asserted in the statements, but simply as proof that the sales

---

[10]     In Section II.C.1.e, the court concludes that Capital Connect's sale associates are likely employees but certainly agents; accordingly, their statements would qualify as opposing party's statements for purposes of Fed. R. Evid. 801(d)(2).  See *United States v. Pena*, 527 F.2d 1356, 1361 (5th Cir. 1976).

associates made the statements, a verbal act. *Tompkins v. Cyr,* 202 F.3d 770, 779 n.3 (5th Cir. 2000) (citing *United States v. F/N/U Pate*, 543 F.2d 1148, 1149 (5th Cir. 1976)).  Therefore, Capital Connect's contention that ADT's declarations are "riddled with hearsay" is unfounded.

Regardless, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss* & *Co. v. Sunrise International Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1985); accord *Dixon*, 835 F.2d at 558; *Sierra Club, Lone Star*, 992 F.2d at 551 ("[T]he district court can accept evidence in the form of deposition transcripts and affidavits.").  The court accepts ADT's and Capital Connect's evidence in the form of declarations and exhibits for purposes of ruling on this motion for a preliminary injunction.[11]

### 2. *There is no relevant factual dispute*

Next, Capital Connect "hotly disputes" the facts at issue on this motion. Capital Connect's Sur-reply at 1; Response at 18-20.  Capital Connect argues that the court should not grant ADT's motion for injunctive relief because it has disputed the

---

[11]     The court will address Capital Connect's arguments with regard to the reliability, sufficiency, and credibility of the individual declarants in the sections below.

facts ADT has alleged and the credibility of ADT's declarations.  Capital Connect's Sur-reply at 1.

    While the court may rely on otherwise inadmissible evidence at the preliminary injunction stage and may issue a preliminary injunction without the presentation of evidence, it can do so only when the facts are not disputed.  *Sierra Club, Lone Star*, 992 F.2d at 551; *Digital Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 777 (N.D. Tex. 2012) (Lindsay, J.) (citing 13 MOORE'S FEDERAL PRACTICE ¶ 65.23) ("Deciding controverted issues of fact based on affidavit testimony, however, especially affidavits containing hearsay-within-hearsay, is discouraged.").

    Federal Rule of Civil Procedure 65(a)(1) provides that "a preliminary injunction [may issue] only on notice to the adverse party."  When parties have raised relevant factual disputes concerning the preliminary injunction, courts have interpreted FED. R. CIV. P. 65(a)(1) to require "a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted."  *PCI Transportation*, 418 F.3d at 546; *Kaepa, Inc. v. Achilles Corporation*, 76 F.3d 624, 628 (5th Cir.), *cert. denied*, 519 U.S. 821 (1996); *Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.*, 446 F.2d 353, 358 (5th Cir. 1971) ("[T]he courts are more cautious about invoking the extraordinary remedy of the preliminary injunction where critical facts are in dispute.").  The Third Circuit, in *Sims v. Greene*, criticized a district court for not holding an evidentiary

hearing to resolve apparently conflicting evidence in the parties' submissions because it put the district court judge "in the position of preferring one piece of paper to another."  161 F.2d 87, 88 (3d Cir. 1947).

ADT, on the other hand, for the purposes of this motion admits Capital Connect's presentation of the facts.  ADT's Sur-reply at 3.  ADT argues that Capital Connect has tried to draw conflicting inferences from ADT's proof but that Capital Connect does not dispute ADT's evidence, which as ADT acknowledges, "would require the Court to convene a hearing and make credibility determinations."  ADT's Reply at 9.

This Circuit permits the district court to rule on a motion for preliminary injunction without a hearing where no factual disputes are involved.  *Kaepa,* 76 F.3d at 628 ("[i]f no factual dispute is involved, . . . no oral hearing is required; under such circumstances the parties need only be given 'ample opportunity to present their respective views of the legal issues involved.'") (quoting *Commerce Park at DFW Freeport v. Mardian Construction Co.*, 729 F.2d 334, 341 (5th Cir. 1984)); see also *PCI Transportation*, 418 F.3d at 546; *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009).  The cases in which the Fifth Circuit has criticized district courts for ruling on an application for preliminary injunction without a hearing fall into two categories. First, the Fifth Circuit has disapproved of ruling on a preliminary injunction where the parties were not given a "fair opportunity" or did not receive sufficient notice

before the court rendered its decision.  See, *e.g.*, *Marshall Durbin Farms*, 446 F.2d at 355-56 (finding inadequate notice in clear violation of Rule 65(a) after the district court scheduled a preliminary injunction hearing just days after the plaintiffs requested such relief); *Parker v. Ryan*, 960 F.2d 543, 544 (5th Cir. 1992).  Second, the Fifth Circuit has overturned a district court's ruling on a motion for a preliminary injunction without a hearing where the parties disputed the central facts underlying the injunction.  See *Heil Trailer International Co. v. Kula*, 542 F. App'x 329, 334 & n.17 (5th Cir. 2013).

This case does not fall into either category.  The Fifth Circuit approves of the resolution of preliminary injunctions without a hearing where the parties were given an opportunity to "present their differing versions" of the underlying facts and the district court determined that there were no disputes regarding the facts necessary to the resolution of the preliminary injunction.  See *PCI Transportation*, 418 F.3d at 546 (district court resolved motion for a preliminary injunction without a hearing where the plaintiff failed to put the underlying contract before the court); *Commerce Park at DFW Freeport*, 729 F.2d at 341; *Esparza v. Board of Trustees*, No. 98-CV-50907, 182 F.3d 915, 1999 WL 423109, at *3 (5th Cir. June 4, 1999) ("[J]ust because some facts are disputed, the court does not have to hold a hearing before ruling on a motion for a [preliminary injunction] unless the parties show there are material facts in dispute."); see also *Dixon*, 835 F.2d at 558-59 (affirming grant of preliminary

injunction without a hearing where adverse party failed to point to any convincing factual disputes material to the decision).

Capital Connect attacks the credibility of twelve of ADT's declarants by attaching transcripts of recorded quality assurance calls. Response at 6-8, 15; Capital Connect's Sur-reply at 1-3. Capital Connect offers proof that eleven of ADT's declarants, ten of whom were the same declarants who had recorded quality assurance calls and signed Alarm Upgrade Agreements in which the customer denies any confusion about whether Capital Connect is affiliated with ADT by initialing next to the line in the contract. Capital Connect's Sur-reply at 3. Capital Connect further attacks the credibility of ADT's evidence by pointing out that two customer declarants corrected the typed declaration through hand-written notes. *Id.* Additionally, Capital Connect seeks to discredit the customer declarants who stated that the sales associate at issue was wearing some Capital Connect gear. *Id.* Lastly, Capital Connect criticizes the viability of the evidence introduced through ADT's litigation manager as speculative and conclusory. *Id.* at 4-5.

Capital Connect, however, does not argue that its sales force has not (1) claimed to have been affiliated with ADT, (2) misrepresented the quality of ADT's equipment to gain favor of the customers, (3) claimed that Capital Connect has bought out or taken over ADT, (4) stated that Capital Connect has purchased the customer's account from ADT, (5) misrepresented that ADT have either gone out of

business or left the local market, or (6) made other misrepresentations or false statements.  Motion at 4.  Capital Connect's arguments surrounding these issues are entirely legal in nature.  For example, Capital Connect's argument that it did not make the statements because it did not authorize the sales associates to make the statements is a legal argument addressed in Section II.C.1.e below.  It is true that Capital Connect disputes certain facts at issue in the case and has raised credibility issues regarding roughly thirteen of ADT's declarants.  Response at 6-8, 15; Capital Connect's Sur-reply at 1-3.  However, the court finds that Capital Connect has failed to present any evidence contradicting ADT's allegations that are central to the court's resolution of the merits of ADT's motion for preliminary injunction and has failed to attack the credibility of ADT's remaining 55 declarants.  Capital Connect does not aver that its sales associates did not make the alleged misrepresentations or did not utter the alleged false statements.  Capital Connect had the opportunity to attach declarations to contradict ADT's declarants' report of the conversations, for example through declarations from its sales associates, to dispute the statements reported by ADT's declarants.  Capital Connect's omission is fatal to its argument that it has presented a factual dispute.

In *McDonald's Corporation v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998), the Eleventh Circuit provided guidance to the court in its resolution of a similar situation.  In *McDonald's,* the plaintiff filed a motion for preliminary injunction for

trademark infringement claims against one of its franchisees.  *Id.* at 1302-03.  The plaintiff submitted affidavit testimony.  *Id.* at 1311-13.  The defendant sought to contest plaintiff's evidence, but failed to actually refute or deny any of the underlying allegations, only criticizing the claims as "fabricat[ions]" and "exaggerat[ions]s".  *Id.* at 1308.  The Eleventh Circuit affirmed the district court's granting of the preliminary injunction without a hearing, finding that the parties' briefing was sufficient because "material facts are not in dispute, or the disputed facts are not material to the preliminary injunction sought."  *Id.* at 1313.

Here, the parties have had sufficient opportunity to present their respective versions of the facts underlying this dispute.  As of August 13, 2015, the parties had notice that unless the court determine[d] that a hearing is necessary to resolve conflicts in the evidence or to make credibility determinations, the court would determine the plaintiffs' request for a preliminary injunction on affidavits and/or deposition and without a hearing, in accordance with FED. R. CIV. P. 43(c).  Order of August 13, 2015 (docket entry 51).  This practice was approved by the Fifth Circuit in *Kaepa*.  In *Kaepa*, where the district court did "not rely on any disputed facts," no oral hearing was required and parties "need[ed] only be given ample opportunity to present their respective views of the legal issues involved."  76 F.3d at 628 (internal quotations omitted).  Capital Connect and ADT have been given ample opportunity to present their respective views of the legal issues involved.  *Anderson*, 556 F.3d at

361 (finding the requirements of FED R. CIV. P. 65(a)(1) met where the district court allowed extensive briefing without holding an evidentiary hearing); see *Dixon*, 835 F.2d at 558 (affirming district court's ruling on preliminary injunction without a hearing where it based its findings of fact on "extensive evidence in the form of affidavits, several thousand pages of documents, business records of earnings, sworn statements, [and] admissions of defendants"); *Dearmore v. City of Garland*, 237 F.R.D. 573, 579 (N.D. Tex. 2006) (Lindsay, J.) (finding that a hearing was not necessary where the issues were "strictly legal in nature," and commenting that the court "would have not held a hearing, and would have decided the matter strictly on the written submissions of the parties" if it had been clear that there were no disputed facts), *aff'd*, 519 F.3d 517 (5th Cir. 2008).

Therefore, the court will determine the merits of the preliminary injunction without a hearing and will "not rely on any disputed facts" in its resolution of the motion basing its decision on the record presented during the "extensive briefing" on the preliminary injunction. *Anderson*, 556 F.3d at 361.

## C. Application

### 1. *Likelihood of Success on the Merits*

Section 43(a)(1)(A) makes liable, "[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, . . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin, sponsorship, or approval of his or her goods,

services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). To

preliminarily enjoin Capital Connect, ADT must show that the use of Capital

Connect's sales tactics are "likely to cause confusion" among consumers as to the

source, affiliation, or sponsorship of Capital Connect's products or services.[12] See *id.*;

15 U.S.C. § 1114(1); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663

(5th Cir. 2000). A "likelihood of confusion" means that confusion is not just

possible, but probable. *Westchester*, 214 F.3d at 663-64; see also *Paulsson*, 529 F.3d at

311 (holding that the district court correctly used the standard "more than a mere

possibility of confusion"). The likelihood of confusion standard also governs ADT's

claims for unfair competition under Texas law.[13] See *id.* at 663-64 n.1; *Elvis Presley*

*Enterprises, Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998).

---

[12]     Capital Connect argues that the test for a false association claim is the five prong test in *King v. Ames*, 179 F.3d 370, 373-74 (5th Cir. 1999). Response at 17. The five factor test quoted in *King* is the test for trademark infringement claims under § 1125(a)(1)(B), not § 1125(a)(1)(A). See *MCW, Inc. v. Badbusinessbureau.com, LLC*, No. 3:02-CV-2727-G, 2004 WL 833595, at *15 nn.13-14 (N.D. Tex. Apr. 19, 2004) (Fish, Chief J.), for an in-depth discussion why the five factor test is the wrong standard, and why the Texas state law claim for unfair competition shares the analysis for unfair competition under § 1125(a)(1)(A). See also *Galvotec Alloys, Inc. v. Gaus Anodes International, LLC*, No. 7:13-CV-664, 2014 WL 6805458, at *5 (S.D. Tex. Dec. 2, 2014); *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corporation*, 53 S.W.3d 799, 806 n.3 (Tex. App.--Austin 2001, pet. denied).

[13]     See also *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 (5th Cir. 2010) ("We note that Amazing Spaces brought claims under the Lanham Act and Texas law. The analysis with respect to Amazing Spaces's claims under the Lanham Act will be dispositive of its corresponding claims under Texas law as well.") (citing *Horseshoe Bay Resort*, 53 S.W.3d at 806 n.3).

- 21 -

ADT argues that Capital Connect has caused not only the *likelihood* of confusion but also *actual* confusion among home security customers as to the "source, affiliation, connection or sponsorship of its alarm services."  Motion at 14.  Capital Connect's sales tactics imply an association with ADT to procure business for another in a "bait-and-switch" move that baffles consumers.  *ADT LLC v. Vision Security, LLC*, No. 13-CV-81197, 2014 WL 3764152, at *5 (S.D. Fla. July 30, 2014).  The Lanham Act protects consumers from being misled by the use of "unfair practices by an imitating competitor."  *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003) (internal quotations omitted).  The language of Section 43(a) is broader than much of the Lanham Act in that it "prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill."  *Dastar Corporation v. Twentieth Century Fox Film Corporation*, 539 U.S. 23, 32 (2003); accord *Texas Tech University v. Spiegelberg*, 461 F. Supp. 2d 510, 523 (N.D. Tex. 2006) (Cummings, J.).

a.  Likelihood of Confusion

The critical question is whether the Capital Connect's sales practices suggest affiliation or endorsement or false association.  *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 484 (5th Cir. 2004).  In determining whether a likelihood of confusion exists, courts consider the following non-exhaustive list of factors:  "(1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of retail outlets and purchasers;

(5) the identity of the advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion." *Id.* at 484-85.  "Courts also consider (8) the degree of care exercised by potential purchasers." *Board of Supervisors for Louisiana State University Agricultural & Mechanical College v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008), *cert. denied*, 556 U.S. 1268 (2009).  No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these "digits of confusion." *Elvis Presley*, 141 F.3d at 194; *Paulsson*, 529 F.3d at 310.  They do not apply mechanically to every case and can serve only as guides, not as an exact calculus.  See *Scott Fetzer*, 381 F.3d at 485.

     In analyzing the "likelihood of confusion," a court should first "consider the application of each digit in light of the specific circumstances of the case" and next "consider the marks in the context that a customer perceives them in the marketplace." *Scott Fetzer*, 381 F.3d at 485 (quoting *Elvis Presley*, 141 F.3d at 197); accord *Lyons Partnership v. Giannoulas*, 179 F.3d 384, 389-90 (5th Cir. 1999).  The court finds that the digits of confusion weigh in favor of ADT.[14]  However, the court

---

[14]    (1) The type of mark allegedly infringed is the use of ADT's trademark company name.  (2) The similarity between the two marks likely weighs in favor of confusion since ADT has alleged that Capital Connect used ADT's mark, not that it infringed upon ADT's mark through use of a similar mark.  (3) ADT monitors home alarm security systems.  Motion at 3.  Capital Connect sells the monitoring of home alarm security systems for Monitronics.  *Id.*  ADT and Capital Connect sell the same service.  (4) The identity of retail outlets and purchasers is not relevant here.  (5) There is no media used, only face to face interactions.  Thus, this element is not relevant here.  (6) ADT claims Capital Connect intentionally seeks to confuse

(continued...)

- 23 -

need not closely analyze each factor here because the court finds that for purposes of a preliminary injunction, ADT has adequately offered sufficient evidence of actual confusion, among other indicia of confusion, in the relevant market.  See *Amstar Corporation v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.) (holding that actual confusion evidence is the "best evidence of likelihood of confusion"), *cert. denied*, 449 U.S. 899 (1980).

### b.  Actual Confusion

Evidence of actual confusion is not necessary to a finding of a likelihood of confusion, but "it is nevertheless the best evidence of likelihood of confusion." *Amstar Corporation*, 615 F.2d at 263.  To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion, see *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 491 (5th Cir. 1992), or consumer surveys, see *Exxon Corporation v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 506 (5th Cir. 1980); *Scott Fetzer*, 381 F.3d at 486.

---

[14](...continued)
customers and intentionally violates § 1125(a)(1)(A).  *Id.* at 3, 11-12; ADT's Reply at 2-3.  Capital Connect's sales tactics appear to deliberately adopt ADT's name "with a view to obtain some advantage from the good will, good name and good trade which [ADT] has built up."  *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.*, 509 F. Supp. 811, 814 (S.D. Tex. 1981) *aff'd as modified*, 681 F.2d 397 (5th Cir. 1982).  This tactic leads the court to weigh the intent digit in favor of ADT as "the very act of [Capital Connect] . . . indicate[s] that [it] expect[ed] confusion and resultant profit."  *Id.*; (7) Evidence of actual confusion is analyzed in Section II.C.1.b. Lastly, (8) the degree of care exercised by potential customers is considered in Section II.C.1.c.

Capital Connect argues that ADT has not reported nearly enough instances of confusion given the size of the market. *See* Response at 14, 22-23 (citing *Holland American Insurance Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) (vacating district court's grant of injunctive relief where the only evidence was one employee affidavit speculating about the potential of numerous lawsuits); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1248-49 (10th Cir. 2013) (concluding that 1.5% of consumers was insufficient evidence to create a genuine issue of fact on motion for summary judgment in an Internet dispute where the exact number of impressions and clicks was calculated by a search engine)). In contrast to the cases on which Capital Connect relies, ADT offers, among other evidence, 55 declarations (the veracity of which Capital Connect does not challenge), four local news reports[15] (whose authenticity Capital Connect does not dispute), and an employee affidavit regarding 269 complaints processed in 2015.

---

[15]     The court recognizes that the news reports contain hearsay, if at a trial the court were to admit the out of court statements for the truth of the matters asserted. However, under the less rigorous preliminary injunction evidentiary standards, the court has considered the news reports to support its finding that ADT has proven actual confusion. Further, the hearsay evidence rule does not bar the admissibility of news reports that "show public perceptions" of Capital Connect's conduct. See *Mariani v. United States*, 80 F. Supp. 2d 352, 362 (M.D. Pa. 1999) ("The hearsay evidence rule does not bar . . . the admissibility of . . . authenticated news reports when used to show public perceptions of corruption, rather than corruption in fact.") (citing *Democratic Party v. National Conservative Political Action Committee*, 578 F. Supp. 797, 829 (E.D. Pa.1983), *aff'd in part, rev'd in part,* 470 U.S. 480 (1985)), *certified question answered*, 212 F.3d 761 (3d Cir.), *cert. denied*, 531 U.S. 1010 (2000).

Very little evidence, however, is required to establish the existence of the actual confusion factor. *Jellibeans, Incorporated v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 845 (11th Cir. 1983); see also *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1544 (11th Cir. 1986) ("It is likely that many consumers who were confused never realized they had been confused and that many of those who did realize they had been confused chose not to spend the time to register a complaint with a faceless corporation. . . ."), *cert. denied*, 481 U.S. 1041 (1987). Furthermore, "an almost overwhelming amount of proof would be necessary to refute" proof of actual confusion. *Dick Littrell's New World Carpets*, 438 F.2d at 489 ("[R]eason tells us that . . . very little proof of actual confusion would be necessary to prove the likelihood of confusion."); *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985) ("In no case have we sanctioned total disregard of evidence of actual confusion; there is simply no precedent for such a view. . . ."); *Soweco, Inc. v. Shell Oil Company*, 617 F.2d 1178, 1186 (5th Cir. 1980), *cert. denied*, 450 U.S. 981 (1981).

The evidence that ADT has submitted shows "more than fleeting mix-up of names." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 230 (5th Cir. 2009). The confusion presented in the affidavits shows actual confusion about what entity the sales associate at the door represented, with what entity the sales associate

was affiliated, how the sales associate came to arrive at the door, and the purpose for which he/she was at the door.  *See* ADT's Appendix; ADT's Supp. Appendix; ADT's Second Supp. Appendix; ADT's Third Supp. Appendix.  Capital Connect argues that customer affidavits are not reliable because they are received by "interested sources" and there is no opportunity to cross-examine the confused individuals.  Capital Connect's Sur-reply at 4 (citing *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 227 (3d Cir. 2000) (affirming district court's finding that four examples of confusion was insufficient evidence of actual confusion)).  The Third Circuit, however, distinguished *Victoria's Secret* from a preliminary injunction to enforce the Lanham Act, finding that reliance on customer complaints in declarations on a motion for preliminary injunction was appropriate, whereas in *Victoria's Secret*, the court had found deficient the use of only four customer declarations as proof of actual confusion on a motion for summary judgment.  See *Arrowpoint Capital Corporation v. Arrowpoint Asset Management, LLC*, 793 F.3d 313, 325 (3d Cir. 2015).

Capital Connect argues that it has also called into question the credibility of roughly thirteen declarations with its transcripts of telephone calls with the customer, signed upgrade agreements disclaiming association between ADT and Capital Connect, and questioning the customer hand-written edits on the declarations.  *See* Response at 6-8, 15; Capital Connect's Sur-reply at 1-3.  For purposes of the preliminary injunction, the court will ignore those declarations to avoid a potential

factual dispute.  The court finds, however, that the remaining 55 declarations, whose

credibility has not been questioned, the four local news reports, and the 269 customer

complaints cited by the ADT representative provide ample evidence to support a

finding of actual confusion in the market.  Second Gold Decl. ¶ 3; see *Xtreme Lashes*,

576 F.3d at 230 ("To ignore this evidence as anecdotal or irrational tramples upon

the province of the trier of fact."); *Half Price Books, Records, Magazines, Inc. v.*

*Barnesandnoble.com, LLC*, No. 3:02-CV-2518-G, 2003 WL 23175436, at *5 (N.D.

Tex. Aug. 15, 2003) (Fish, Chief J.).  Since there is actual confusion, ADT has

satisfied the "likelihood of confusion" element of the § 1125(a)(1)(A) preliminary

injunction analysis.  *Soweco*, 617 F.2d at 1186 ("Actual confusion is, however, strong

proof that the likelihood of confusion exists").

### c.  Reasonably Prudent Purchaser

Capital Connect argues that ADT has failed to prove that it has a substantial

likelihood of success on the merits of this case because the confused customers in the

declarations fail to pass the reasonably prudent purchaser standard.[16] *See* Response at

---

[16]      ADT maintains that the Fifth Circuit does not utilize the reasonably
prudent consumer standard.  ADT's Reply at 7-8 (citing *Source, Inc. v. SourceOne, Inc.*,
No. 3:05-CV-1414-G, 2006 WL 2381594, at *6 (N.D. Tex. Aug. 16, 2006) (Fish,
Chief J.), following *Fuji Photo Film Company*, 754 F.2d at 597 ("While trademarks
seek to protect the ultimate consumer from confusion, the identity of the person
confused is essentially a non-factor in the likelihood of confusion analysis.").  The
Fifth Circuit does not appear to have explicitly addressed whether the reasonably
prudent consumer standard applies under § 1125(a)(1)(A).  Therefore, this court
considers Capital Connect's argument to be that the confused consumers are not
(continued...)

20-23.  Capital Connect urges that it has established various preventative measures to prevent any customer confusion, including requiring its sales force to wear Capital Connect gear and to obtain signed waiver agreements informing the customer of the absence of any affiliation with ADT.  *Id.*  It reasons that if the customer is confused, as the declarants claim to be, then they fail the reasonably prudent purchaser standard and ADT will not likely succeed on the merits.  *Id.*

Courts recognize that customers are more likely to be confused where the products or services are closely related.  See *Davis v. Walt Disney Co.*, 430 F.3d 901, 904 (8th Cir. 2005), *cert. denied*, 547 U.S. 1159 (2006); *North American Medical Corporation v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1222 (11th Cir. 2008).  Further, courts are aware of the fact that where there is an "explicit representation of a relationship" between the violator and the claimant, a customer is more likely to be confused.  See *Axiom Worldwide, Inc.*, 522 F.3d at 1223.  Here, only a few customer declarants claimed that the Capital Connect's sales associate actually pretended to be an ADT agent.  ADT's Reply at 4.  Most maintained that the Capital Connect sales associate claimed some affiliation with ADT.  *Id.*  Therefore, the presence of Capital Connect's gear does not persuade the court to conclude that any confused customer

---

[16](...continued)
reasonable, but the court concludes that the consumers have passed the reasonable consumer standard regardless of its application.

who sees the gear but is still confused as to Capital Connect's affiliation with ADT

must not be a prudent consumer.

Additionally in *Better Business Bureau*, 681 F.2d at 403, the Fifth Circuit noted

that where one implies that he is "acting at the behest" or "under the direction" of

another, and this "impression is reinforced by the context in which the

representations were made," there is a strong inference of endorsement and thereby

confusion.  Therefore, situations and phrases that may seem clear to observers in the

abstract may nevertheless, in context, be confusing to a reasonably prudent consumer.

Despite the protective measures Capital Connect claims to have implemented,

the declarants are actually confused by Capital Connect's sales tactics and the law

understands the reasonableness of consumer confusion in similar situations.  *Id.*

Therefore, the court finds that for the purposes of the motion for a preliminary

injunction, ADT has sufficiently shown actual confusion of reasonably prudent

purchasers.

d  Initial Interest Confusion

In its response and sur-reply to ADT's motion for preliminary injunction,

Capital Connect submits proof that it notified roughly a dozen customers, through

disclaimers in its agreement and a telephone call, that it is not affiliated in any way

with ADT.  Response at 6, 8, and 21.  In its reply, ADT cites cases that discuss the

"initial interest confusion" doctrine.  ADT's Reply at 5.  The initial interest confusion

- 30 -

doctrine applies when "the Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated." *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996). This "bait and switch" technique allows competitors to get a foot in the door and engage the customer by using the goodwill established by the senior user to break the ice. *Id.*; *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975).

In its sur-reply, Capital Connect argues, *inter alia*, (1) that the initial interest confusion doctrine does not apply here; (2) that if it does apply, it is a *de minimis* factor; and (3) that "a recent Supreme Court decision brings into serious question the continued viability of initial confusion as a theory of liability." Capital Connect's Sur-reply at 5-10. Some scholars have criticized the "initial interest confusion" doctrine because they argue the senior user has not suffered any economic harm if the confusion is dispelled by the time of the transaction ends. See, *e.g.*, *Deborah R. Gerhardt, Lexmark and the Death of Initial Interest Confusion*, 7 LANDSLIDE 22, 27 (2014); Jennifer E. Rothman, *Initial Interest Confusion: Standing at the Crossroads of Trademark Law*, 27 CARDOZO L. REV. 105, 189-91 (2005). In *Lexmark International, Inc. v. Static Control Components, Inc.*, __ U.S. __, 134 S. Ct. 1377, 1391 (2014), the Supreme Court case cited by Capital Connect, the Court stated that "a plaintiff suing

under 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." Professor Gerhardt predicts that the result reached in *Lexmark* will lead to the end of the initial interest doctrine. *See* Gerhardt, *Lexmark*, 27 CARDOZO at 189. No court has taken the statement in *Lexmark* to apply to the initial interest confusion doctrine or unfair competition claims generally, as Capital Connect suggests this court should. The excerpt in *Lexmark* comes from a section of the opinion in which the Supreme Court holds that the proximate causation principle from common law torts applies to a Section 43(a) claim, thus narrowing the class of third parties who can claim to have been injured by a Lanham Act violation. *Lexmark*, 134 S. Ct. at 1390-91. It does not directly relate to the issue before the court here.

Today, the initial interest doctrine most often appears in Lanham Act disputes based on Internet browsing, metatags, and how well websites are labeled when a user is moving from one website to another. See, *e.g.*, *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1147 (9th Cir. 2011); *Playboy Enterprises, Inc. v. Netscape Communications Corporation*, 354 F.3d 1020, 1027 (9th Cir. 2004)).

The Fifth Circuit still recognizes the doctrine, although it has not faced the question of whether it is still valid after *Lexmark*. *Elvis Presley*, 141 F.3d at 204 ("Infringement can be based upon confusion that creates initial consumer interest,

even though no actual sale is finally completed as a result of the confusion.");

*National Business Forms & Printing, Inc. v. Ford Motor Company*, 671 F.3d 526, 532 (5th

Cir. 2012) ("Actual confusion that is later dissipated by further inspection of the

goods, services, or premises, as well as post-sale confusion, is relevant to a

determination of a likelihood of confusion."); *John Crane Production Solutions, Inc. v.*

*R2R And D, LLC*, 861 F. Supp. 2d 792, 799-800 (N.D. Tex. 2012) (Fitzwater, Chief

J.).

The court concludes that initial interest confusion still appears to be a valid

theory under Fifth Circuit law, and that the Supreme Court's analysis in *Lexmark* did

not abrogate the theory.  Here, however, the court does not base its "likelihood of

confusion" analysis on the viability of the initial interest confusion doctrine,

although ADT's consumers' "initial interest confusion" is relevant to the court's

determination of a likelihood of confusion.  *Elvis Presley*, 141 F.3d at 204.  The court

concludes that ADT has carried its burden of proving "likelihood of confusion" by

producing sufficient evidence that Capital Connect's false sales pitches actually

confuse customers into thinking there is some affiliation with ADT or that ADT's

equipment is faulty.  See *Elvis Presley*, 141 F.3d at 204; *Ford Motor Company*, 671 F.3d

at 532.

e.  Vicarious Liability

Capital Connect argues that it is not "liable for the unauthorized conduct of independent contractors."  Response at 18-20.  Capital Connect's argument is that the sales force that is going door-to-door selling its services consists of independent contractors, not employees.  *Id.*  Therefore, according to Capital Connect, it is not liable unless ADT can prove that Capital Connect authorized its independent contractors to act in the manner ADT has alleged.  *Id.*  Moreover, Capital Connect offers proof of its training, training manual, and other rules it implements to assure that its sales force does not violate the Lanham Act or other laws throughout the jurisdictions in which it operates.  *Id.*

ADT argues that Capital Connect is liable for the conduct of its sales force, whether classified as employees or independent contractors, because the sales force consists of agents under Capital Connect's control as principal.  ADT's Reply at 10-11.

"The essential element of an agency relationship is the right of control."  *In re Carolin Paxson Advertising, Inc.*, 938 F.2d 595, 598 (5th Cir. 1991).  As ADT argues, Capital Connect's briefing establishes that Capital Connect exerts control over its sales force.  Response at 4-6, 18-20.  Capital Connect offers proof that (a) it requires its sales force to wear Capital Connect gear (*Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440, 449-50 (2003) (holding that whether an organization can hire

- 34 -

or fire or set the rules and regulations of the individual's work is relevant to whether one is an employee); (b) it requires its sales force to complete training (*Mares v. Marsh*, 777 F.2d 1066, 1068 (5th Cir. 1985) (finding that training suggests an employment relationship); (c) it requires its sales force to sign a Code of Conduct (*Wells*, 538 U.S. at 449-50); (d) it requires its sales force to wear a Capital Connect badge (*id.*); (e) it requires its sales force to obey its sales rules (*id.*); and (f) it punishes its sales force if it violates any of these provisions (*id.*).  Response at 4-6, 18-20. Thus, whether the sales force be labeled independent contractors or employees for purposes of this motion for preliminary injunction, the evidence before the court clearly shows that Capital Connect has the right to control its sales force.  *Hopkins v. Cornerstone America*, 545 F.3d 338, 347-48 (5th Cir. 2008), *cert. denied*, 556 U.S. 1129 (2009); *Brock v. Mr. W Fireworks*, 814 F.2d 1042, 1049 (5th Cir.) ("subjective beliefs cannot transmogrify objective economic realities"), *cert. denied*, 484 U.S. 924 (1987); *In re Carolin Paxson*, 938 F.2d at 598.

Anything that occurs during the sales pitch of the sales associate is clearly within the scope of the agency, as it is the central purpose of the principal-agency relationship here.  *Celtic Life Insurance Company v. Coats*, 885 S.W.2d 96, 99 (Tex. 1994) (holding that a principal cannot escape liability by claiming that it did not authorize misrepresentations occurring before a sale and that such misrepresentation

occurred within the scope of agency); *Morrow v. Daniel*, 367 S.W.2d 715, 718 (Tex. Civ. App.--Dallas 1963, no writ) (same).

Capital Connect's argument that it escapes liability unless ADT proved that Capital Connect authorized the misleading or false representations fails because it is clear that Capital Connect has the right to control the actions of its sales force, whether the sales personnel are classified as employees or independent contractors. See *Meyer v. Holley*, 537 U.S. 280, 285-86 (2003); see also *Potomac Conference Corporation of Seventh-day Adventists v. Takoma Academy Alumni Association, Inc.*, 2 F. Supp. 3d 758, 770-71 (D. Md. 2014) (finding a president of an association liable for the actions of the association in Lanham Act context where the president exercised control and guidance for the association's actions).  Capital Connect is liable for the actions of its sales associates, who are its agents, operating within the scope of that agency.  See *Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 553-54 (N.D. Tex. 1997) (Sanders, J.) (holding an employer liable for an employee's infringement where the former had supervisory authority over the latter's activities), *aff'd*, 168 F.3d 486 (5th Cir. 1999).

f.  Misleading Use of "Upgrade" and "Update"

ADT alleges that Capital Connect misleads customers, among other tactics, by falsely associating itself with ADT through the use of the terms "upgrade" and "update."  Motion at 3-4.  ADT claims that Capital Connect's sales force comes to

their customers' homes and asserts their systems need to be "updated" or "upgraded". *Id.*  Customers report that this practice confused them, as they inferred this meant the sales associate was affiliated with ADT.  *Id.*; *see, e.g.*, ADT's Third Supp. Appendix, Exhibit 1C, Appendix_000018-20, Declaration of Florence Allen ¶ 5 ("He told me he was at my home to upgrade my alarm equipment."); ADT's Third Supp. Appendix, Exhibit 1O, Appendix_000071-73, Declaration of Jose Aviles ¶ 6 ("The representative told me that Capital was an ADT affiliate there to upgrade my alarm panel for free."); ADT's Third Supp. Appendix, Exhibit 1AA, Appendix_000106-108, Declaration of Pauline Pedroza ¶ 6 ("The representative stated that he was there to upgrade my keypad.").

Capital Connect contends that the terms "upgrade" and "update" are not misleading or false and that the use of them during a sales pitch is not a violation of the Lanham Act.  Response at 23-24.  In *Stokely-Van Camp, Inc. v. Coca-Cola Company*, 646 F. Supp. 2d 510, 529 (S.D. N.Y. 2009), a district judge in the Southern District of New York held that Powerade's use of the phrase "Upgrade your formula. Upgrade your Game" on its labels was not "literally false" or "false by necessary implication" because reasonable consumers could interpret the phrase to compare Powerade to Gatorade, or could compare this new Powerade drink to older Powerade drinks.  On the other hand, in *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969), *supplemented*, 413 F.2d 1126 (9th Cir. 1969), the Ninth

Circuit noted that a Volkswagen repair specialist could use the VW mark in his advertisements, but he "must not do so in a manner which is likely to suggest to his prospective customers that he is part of Volkswagen's organization of franchised dealers and repairmen."  The key analysis is whether the use of any term, or any protected mark leads to a "likelihood of confusion" surrounding the context of the alleged misleading use.  *Better Business Bureau*, 681 F.2d at 403 (holding that the false impression "is reinforced by the context in which the representations were made").  Here, Capital Connect's sales associates approach a door, mention "upgrade" or "update," and refer to the security alarm system already installed, implying a relationship with ADT.  See *Mary Kay, Inc.*, 661 F. Supp. 2d at 644 (concluding that by using language that suggests that the defendants act as an "outlet" for Mary Kay independent beauty consultants, they imply a relationship between the defendants and those Mary Kay consultants).  Showing a knowledge of the pre-existing security alarm system and referencing the alarm system as needing an upgrade leads a rational person to conclude that the salesperson is in some way affiliated with the pre-existing alarm service provider.  As in *Volkswagenwerk* or *Better Business Bureau*, the context of the verbal exchange "reinforce[s]" the false inference made by the consumer.  *Better Business Bureau*, 681 F.2d at 403; *Volkswagenwerk*, 411 F.2d at 352.

No matter whether the statements at issue are ambiguous or true but misleading, the plaintiff must present evidence of actual deception.  See *Pizza Hut,*

*Inc. v. Papa John's International, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000), *cert. denied*,

532 U.S. 920 (2001); *American Council of Certified Podiatric Physicians & Surgeons v.*

*American Board of Podiatric Surgery, Inc.*, 185 F.3d 606, 616 (6th Cir. 1999); *Johnson &*

*Johnson * Merck Consumer Pharmaceuticals Company v. Smithkline Beecham Corporation*,

960 F.2d 294, 297 (2d Cir. 1992) (stating that when a "plaintiff's theory of recovery

is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by

extrinsic evidence, that the challenged commercials tend to mislead or confuse");

*Avila v. Rubin*, 84 F.3d 222, 227 (7th Cir. 1996).  By the declarations of dozens of

customers confused by the use of the terms "upgrade" and "update," as well as four

news reports citing the misleading statements, ADT has shown actual deception[17] in

that "consumers were actually deceived by the defendant's ambiguous or true-but-

misleading statements."  *Pizza Hut*, 227 F.3d at 497 (quoting *American Council*, 185

F.3d at 616).

    To recapitulate, for purposes of the present motion, ADT has offered sufficient

evidence of actual confusion resulting from Capital Connect's use of the terms

"upgrade" and "update" in the context of door-to-door sales pitches to warrant the

suspension of the practice pending a resolution of the case on the merits.  ADT has

satisfied the court that there is substantial likelihood that [it] will ultimately prevail

on the merits.  See *Paulsson*, 529 F.3d at 309.

---

[17]    *See* Section II.C.1.a.

2. *Irreparable Harm*

The analysis for determining whether harm is irreparable encapsulates the purpose of a preliminary injunction. An injury is generally considered to be irreparable if the injury cannot be undone through monetary relief. *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985) (stating the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[s] heavily against a claim of irreparable harm"). An injunction is appropriate only if the anticipated injury is imminent and irreparable. *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir.), *cert. denied*, 423 U.S. 930 (1975).

If determining the amount of damage would be extremely difficult, the court can consider the harm irreparable. *ICEE Distributors, Inc. v. J&J Snack Foods Corporation*, 325 F.3d 586, 597 (5th Cir. 2003); *Wilkinson v. Manpower, Inc.*, 531 F.2d 712, 714 (5th Cir. 1976). To be considered irreparable, the injury in question must imminent and cannot be speculative. *Watson v. Federal Emergency Management Agency*, 437 F. Supp. 2d 638, 648 (S.D. Tex. 2006), *vacated*, 2006 WL 3420613 (5th Cir. 2006).

a. Presumption

ADT argues that for "the purposes of awarding a preliminary injunction in a Lanham Act case, irreparable injury is presumed once the plaintiff has shown a

likelihood of confusion." Motion at 15 (citing *Abraham v. Alpha Chi Omega*, 708 F.3d

614, 627 (5th Cir.), *cert. denied*, __ U.S. __, 134 S. Ct. 88 (2013); accord, *e.g.*, *S & H

Industries, Inc. v. Selander*, 932 F. Supp. 2d 754, 765 (N.D. Tex. 2013) (Lynn, J.);

*Mary Kay*, 661 F. Supp. 2d at 640; *Hawkins Pro-Cuts v. DJT Hair*, No. 3:96-CV-1728-

R, 1997 WL 446458, at *7 (N.D. Tex. July 25, 1997) (Buchmeyer, Chief J.); see also

*Clearline Technologies Limited v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 715 (S.D.

Tex. 2013) (presumption of irreparable harm most appropriate in cases involving

direct competitors)).

Capital Connect responds that there is no presumption of irreparable harm.

Response at 11, 14 (citing *Ellipse Communications, Inc. v. Caven*, No. 3:07-CV-1922-O,

2009 WL 497268, at *1 (N.D. Tex. Feb. 26, 2009) (O'Connor, J.) ("the Fifth Circuit

has avoided expressly adopting a presumption of irreparable injury.")).

Historically, upon a showing of likelihood of confusion in Lanham Act

preliminary injunction suits, courts have presumed a showing of irreparable harm.

See, *e.g.*, *Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods

Corporation*, 799 F.2d 6, 14 (1st Cir. 1986); *McNeil-PPC, Inc. v. Pfizer Inc.*, 351

F. Supp. 2d 226, 250 (S.D. N.Y. 2005). However, three recent United States

Supreme Court cases, one of which involved a Lanham Act claim, have counseled

against presuming an irreparable injury on a motion for a preliminary injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393 (2006) (rejecting a perceived

"categorical" rule under Federal Circuit precedent that where a patent had been

infringed, an injunction would issue presuming irreparable harm); *Winter v. Natural*

*Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (holding that a possibility of

irreparable harm was "too lenient" and that the "plaintiffs seeking preliminary relief

[must] demonstrate that irreparable injury is *likely* in the absence of an injunction")

(emphasis in original); *Lexmark*, 134 S. Ct. at 1395 (stating that while the plaintiff

alleged enough to proceed under § 1125(a), it could not obtain relief "without *evidence*

of injury proximately caused by Lexmark's alleged misrepresentations") (emphasis in

original).  Following those decisions, many circuits have abandoned the presumption

of irreparable harm in suits seeking a preliminary injunction under the Lanham Act.

See, *e.g.*, *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 161 (2d Cir.

2007); *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126-27 (4th Cir.

2011); *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d

1239, 1249-51 (9th Cir. 2013); *Axiom Worldwide, Inc.*, 522 F.3d at 1227.

Some Fifth Circuit rulings continue to recognize the presumption.  *Abraham*,

708 F.3d at 626-27 ("[a]ll that must be proven to establish liability and the need for

an injunction against infringement is the likelihood of confusion -- injury is

presumed"); *Clearline Technologies*, 948 F. Supp.2d at 707-08; *Southern Snow*

*Manufacturing Co., Inc. v. SnoWizard Holdings, Inc.*, No. 06-CV-9170, 2014 WL

1652436, at *9 (E.D. La. Apr. 24, 2014).  Other courts have avoided "expressly

adopting this presumption of irreparable injury." *Paulsson*, 529 F.3d at 312; *BuzzBallz, LLC v. JEM Beverage Company, LLC*, No. 3:15-CV-0588-L, 2015 WL 3948757, at *6 (N.D. Tex. June 26, 2015) (Lindsay, J.); *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 927-29 (S.D. Tex. 2014). A recent Fifth Circuit case affirmed a Western District of Texas decision that had abandoned the presumption. *Eastman Chemical Company v. PlastiPure, Inc.*, 969 F. Supp. 2d 756, 767-68 (W.D. Tex. 2013), *aff'd*, 775 F.3d 230 (5th Cir. 2014). Finally, the Southern District of Texas recently held that the presumption of irreparability of harm still exists under a Lanham Act claim based "on alleged comparative misrepresentations" by a competitor. *Greater Houston Transportation Company v. Uber Technologies, Inc.*, No. 4:14-CV-0941, 2015 WL 1034254, at *21 (S.D. Tex. Mar. 10, 2015).

One court in this circuit aptly labeled the state of the presumption of irreparable harm for preliminary injunctions brought under the Lanham Act as "somewhere between shaky and reaffirmed." *T-Mobile*, 991 F. Supp. 2d at 928. This court need not determine whether the Fifth Circuit continues to recognize the presumption of irreparable harm upon a showing of likelihood of confusion under § 1125(a)(1)(A) of the Lanham Act because ADT has sufficiently alleged and proven imminent irreparable harm that cannot be remedied through monetary damages alone.

b.  Irreparable Harm

ADT alleges that it is irreparably harmed by Capital Connect's sales tactics

because Capital Connect (a) confuses its customers as well as the market generally

(Gold Decl. ¶ 13); (b) disrupts ADT's relationships with its customers, using false

pretenses to induce customers to uninstall their ADT equipment, install defendants'

equipment, terminate their contracts, and execute new contracts for security services

with defendants (*id.* ¶ 15); (c) damages ADT's goodwill and reputation (*id.* ¶ 16);

(d) unfairly exploits ADT's enormous investments of money and effort for over a

century (*id.* ¶ 18); (e) injures customers who are misled (*id.* ¶ 18); (f) diminishes

customer confidence in ADT's goods and services (*id.* ¶¶ 15-18); and (g) interferes

with ADT's business relations and contracts with its own customers.  See *T-Mobile

USA, Inc. v. Ataricom, Inc.*, No. 3:09-CV-1542-K, 2009 WL 3233542, at *2 (N.D.

Tex. Sept. 14, 2009) (Kinkeade, J.) (concluding that "tortious interference with

business relationships," as well as "loss of goodwill and damage to its reputation,"

prove irreparable injury to plaintiff in Lanham Act case).

Capital Connect rejoins that ADT submitted no proof of any damage to ADT's

reputation or goodwill, as shown by most ADT's declarants who "testify about their

happiness with ADT" and its products and services.  Capital Connect's Sur-reply at 2.

ADT offers evidence that Capital Connect continues to disparage the quality of

ADT's equipment/service and misleads customers into thinking Capital Connected is

associated with ADT.  Motion at 3-4; ADT's Reply at 3-4.  The harm from Capital

Connect's "casting aspersions" on ADT "flows directly from the audience's belief" in

the denigrations and misrepresentations.  *Lexmark*, 134 S. Ct. at 1393.  Courts

recognize that even where products or services continue to enjoy strong reputations in

the market, those products or services would suffer irreparable harm in the absence of

an injunction preventing a competitor from continuing to make disputed advertising

claims challenged as false under the Lanham Act.  See *Groupe SEB USA, Inc. v. Euro-

Pro Operating LLC*, 774 F.3d 192, 204-05 (3d Cir. 2014).

ADT has shown that Capital Connect's sales force continues to mislead and

confuse its customers as it continues to receive more customer complaints.  Motion at

3-4; ADT's Reply at 3-4.  If Capital Connect continues sales tactics that mispresent

the nature of its relationship to ADT, ADT has lost control of its brand.  *Paulsson*,

529 F.3d at 313 (holding that where misrepresenting party continued "to use the

mark" the senior user "had lost control of the quality of the technology that was

being associated with its mark"); *ICEE Distributors*, 325 F.3d at 596-97 (accord).  As

this court and others have recognized, "if one trademark user cannot control the

quality of the unauthorized user's goods and services, he can suffer irreparable harm."

*Mary Kay*, 661 F. Supp. 2d at 640 (*citing Hawkins Pro-Cuts, Inc.*, 1997 WL 446458, at

*7).  Capital Connect operates its business in a manner that leaves ADT "powerless to

control" its reputation and place in the market, and without an injunction, ADT will

suffer irreparable harm.  *Mary Kay*, 661 F. Supp. 2d at 640; see also *Groupe SEB*, 774

F.3d at 205 (concluding that harm to brand reputation and goodwill "is impossible to

calculate"); *PBM Products*, 639 F.3d at 126-27 (noting the difficulty of proving

irreparable harm in false advertising cases, but affirming district court's grant of

permanent injunction where jury concluded defendant's statements had misled

consumers and evidence showed harm to plaintiff's reputation).

     In making this determination, the court is not presuming harm but is "drawing

fair inferences from the facts in the record."  *Groupe SEB USA*, 774 F.3d at 205.

Capital Connect has "unfairly exploited" ADT's "time, effort, and expense exerted to

create and define its brand."  *T-Mobile*, 991 F. Supp. 2d at 929 (finding that this

exploitation led to "T-Mobile's loss of future goodwill or customer loyalty"); *BDO

Seidman LLP v. Alliantgroup, L.P.*, No. 08-CV-905, 2009 WL 1322555, at *8 (S.D.

Tex. May 11, 2009) (same).  ADT's lack of control over its reputation in the

marketplace caused by Capital Connect's misrepresentations to ADT's customers,

Capital Connect's continuing practice of disrupting ADT's customer relations through

misleading sale pitches, and Capital Connect's continuing exploitation of ADT's

goodwill and reputation lead this court to conclude that ADT has proven irreparable

harm sufficient to satisfy the second element of its motion for preliminary injunction.

c.  Adequacy of Money Damages

While courts are willing to consider a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable by showing that the loss cannot be measured in money damages.  See *Millennium Restaurants Group, Inc. v. City of Dallas*, 181 F. Supp. 2d 659, 666 (N.D. Tex. 2001) (Fish, J.); *Digital Generation*, 869 F. Supp. 2d at 778.  Capital Connect argues that ADT has failed to prove that monetary damages would not adequately remedy the harm it alleges Capital Connect has caused.  Response at 16-17; see *Paulsson*, 529 F.3d at 312 ("[A]n injury is irreparable only if it cannot be undone through monetary remedies.").

A party sufficiently proves that monetary damages are not adequate when it brings forward evidence, in the form of affidavits, declarations, or any other support, that shows imminent harm that is difficult to quantify.  *Brink's Inc. v. Patrick*, No. 3:14-CV-0775-B, 2014 WL 2931824, at *8 (N.D. Tex. June 27, 2014) (Boyle, J.).  ADT has shown that Capital Connect is disparaging its brand and is continuing to use ADT's reputation and good will to mislead ADT's customers into buying Capital Connect's services.  Motion at 3-4; ADT's Reply at 3-4.  Courts agree that the damage caused by this sort of Lanham Act violation is difficult to quantify.  See *Paulsson*, 529 F.3d at 313 (holding that damage due to lack of control of its brand and exploitation of its reputation "could not be quantified"); see also, *Better Business*

- 47 -

*Bureau*, 681 F.2d at 403; *Groupe SEB USA*, 774 F.3d at 205 (holding that harm to brand reputation and goodwill "is impossible to quantify"); *Brink's*, 2014 WL 2931824, at *8.

### d. Imminence

To be considered irreparable, the injury in question must be imminent. *Chacon*, 515 F.2d at 925; *Watson*, 437 F. Supp. 2d at 648. Capital Connect argues that ADT's alleged irreparable injury is not imminent because ADT's customer declarations date from 2013 to earlier this year. Response at 11-12; Capital Connect's Sur-reply at 2 n.3.

The classic example of when an injunction is not appropriate due to lack of imminent need is in *Seven-Up Co. v. Coca-Cola Co.*, "where the defendant had not used the challenged presentations in five years and the presentations were outdated and essentially useless at the time the injunction was requested." *Eastman Chemical Company v. PlastiPure, Inc.*, 969 F. Supp. 2d 756, 768 (W.D. Tex. 2013) (citing *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1390 (5th Cir. 1996)), *aff'd*, 775 F.3d 230 (5th Cir. 2014). In *Eastman Chemical*, the court noted that where "there is undoubtedly a possibility" of repetition of similar misrepresentations in the future, imminence is met. *Id.*

Here, ADT has not only shown a possibility that Capital Connect might repeat its sales tactics but it has also shown that Capital Connect continues to use those

sales tactics, as evidenced through the recent complaints ADT has received.  ADT's

Reply at 3-4.  Capital Connect's continued use of these tactics is strong evidence that

ADT will be irreparably harmed if an injunction is not issued to stop this imminent

threat of misrepresentation.  *Travelhost, Inc. v. Modglin*, No. 3:11-CV-0456-G, 2012

WL 2049321, at *5-6 (N.D. Tex. June 6, 2012) (Fish, J.) (holding that defendants

continuing behavior in violation of a non-compete clause led the court to reconsider

the need for a preliminary injunction, and on reconsideration grant the preliminary

injunction); *General Motors Corporation v. Phat Cat Carts, Inc.*, 504 F. Supp. 2d 1278

1287-88 (M.D. Fla. 2006) (accord).

Further, Capital Connect argues that ADT unreasonably waited "at least eight

months" to seek emergency injunctive relief, and therefore this court cannot grant

ADT relief because ADT has failed to prove imminent need.  Response at 11-12;

Capital Connect's Sur-reply at 2 n.3  "Absent a good explanation, a substantial period

of delay militates against the issuance of a preliminary injunction by demonstrating

that there is no apparent urgency to the request for injunctive relief."  G*onannies, Inc.

v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (Lindsay, J.)

(internal quotations omitted); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2nd Cir.

1985).  Where parties fail to explain or justify the delay between the facts underlying

the need for the preliminary injunction and the motion for the injunction, courts

readily decline motions to enjoin for lack of urgency.  *Ellipse Communications*, 2009

WL 497268, at *1-2 (N.D. Tex. Feb 26, 2009) (O'Connor, J.) (no explanation

provided); *Gonannies*, 464 F.Supp.2d at 609 (no irreparable injury where plaintiff

waited six months after discovering allegedly infringing use before seeking injunction

and provided no explanation); *Innovation Ventures, LLC v. Ultimate Lifestyles, LLC*, No.

4:08-CV-232, 2009 WL 1490588, at *3 (E.D. Tex. May 27, 2009) (no irreparable

injury where plaintiff waited nine months after learning of infringing sale and

provided no explanation).

   ADT argues that it has not unreasonably delayed because it was investigating

the claims, wanted to ensure that it had enough representation of confused customers

to support a claim of likelihood of confusion in the marketplace, and did not

anticipate the recent increase in complaints about Capital Connect.  ADT's Reply at

12-13 (citing *Tough Traveler, Limited v. Outbound Products*, 60 F.3d 964, 968 (2d Cir.

1995); accord *BP Chemicals Limited v. Formosa Chemical & Fibre Corporation*, 229 F.3d

254, 264 (3d Cir. 2000) ("a delay caused by a plaintiff's good faith efforts to

investigate an infringement or to determine how serious an infringement is does not

preclude a finding of irreparable harm"); 6 McCarthy on Trademarks § 31:32 (4th

ed. 2015)).

   While there has been a delay from the time when ADT first learned of Capital

Connect's sales tactics through a customer complaint[18] and the filing of this motion

_____

[18]      One of ADT's customer declarants, Joan Homann, described her

                                                        (continued...)

- 50 -

for this preliminary injunction, ADT has given a reasonable explanation for the delay.

ADT maintains that the delay occurred because it was investigating the customer

complaints in good faith.  ADT's Reply at 12-13.  Courts permit delays when

determining the imminence of alleged irreparable harm where delays were "caused by

[plaintiff's] good faith efforts to investigate facts and law."  *Marks Organization, Inc. v.*

*Joles*, 784 F. Supp.2d 322, 333-34 (S.D. N.Y. 2011); *Formosa Chemical*, 229 F.3d at

263-64; *Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26,

35 (1st Cir. 2011).  Since the majority of the customer complaints arose in the last

year, ADT found an increase in customer complaints through the first few months of

2015 (especially in May, June and July), and claims to have been investigating in

good faith, the court finds that the delay does not undermine the imminent injury

alleged here.

### e.  Safeguards

Capital Connect's last argument as to why ADT has not suffered an irreparable

injury is that Capital Connect has implemented "safeguards" to prevent its sales force

from engaging in the conduct at issue here.  Response at 14-15.  This argument is

---

[18](...continued)
confusion resulting from a door-to-door exchange with Capital Connect on July 11,
2013.  ADT's Appendix in Support of Motion for Preliminary Injunction, Exhibit 9
¶ 4.  If this were ADT's primary basis to support its proof of actual confusion, the
court would find the delay here warrants a denial of the preliminary injunction.  The
vast majority of the customer complaints, however, describe incidents that occurred
from the end of 2014 to the present.  *See* ADT's Appendix; ADT's Supp. Appendix;
ADT's Second Supp. Appendix; ADT's Third Supp. Appendix.

supported primarily by an unreported District of Utah opinion applying Utah state law. *Vivint, Inc. v. Elite Security Services, Inc.*, No. 2:12-CV-692, 2012 WL 6596855, at *2 (D. Utah Dec. 18, 2012) (denying preliminary injunction after defendant described safeguards taken against inappropriate sales practices and noting that plaintiff "failed to present any additional actions or procedures that it contends [defendant] should or could adopt to stop such occasional errant behavior."). This case is not binding on this court, and that court did not analyze the Lanham Act violation, but focused on principles of Utah common law. *Id.*

The only other case Capital Connect cites for the proposition that its safeguards prevent a finding of irreparable harm is *Federal Express Corporation v. Robrad, LLC*, No. 3:14-CV-2152-B, 2014 WL 3880806, at *3 (N.D. Tex. Aug. 7, 2014) (Boyle, J.). This case is distinguishable from *Federal Express*. In *Federal Express*, there was no evidence that the defendant continued to use the allegedly infringing material, and the potential use of the allegedly harmful material was speculative. *Id.* Here, there is strong evidence that Capital Connect is continuing to misrepresent its affiliation with ADT and is continuing to confuse ADT's customers. ADT's Reply at 3-4.

The court can see no further relevance of Capital Connect's safeguards to ADT's claims that Capital Connect's sales tactics continue to cause ADT irreparable harm. Regardless of the safeguards Capital Connect claims to have implemented, its

sale force is still causing irreparable harm to ADT through its misrepresentations.

Motion at 3-4; ADT's Reply at 3-4.

### 3. *Capital Connect's Lawful Interests*

Capital Connect argues that its lawful interests will be adversely affected by an injunction because an injunction will "stymie competition," harm its standing in communities it serves, dictate the speech of its sale force, and would be impossible to monitor.  Response at 24 n.15.  First, the injunction will not stymie competition where it only prevents illegal unfair competition.  See, *e.g.*, *C.E. Services, Inc. v. Control Data Corporation*, 759 F.2d 1241, 1249 (5th Cir.) ("Only 'fair' competition will do, for 'if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed.'") (quoting *Leonard Duckworth, Inc. v. Michael L. Field & Co.*, 516 F.2d 952, 958 (5th Cir. 1975)), *cert. denied*, 474 U.S. 1037 (1985); *GoForIt Entertainment, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 739 n.21 (N.D. Tex. 2010) (Fitzwater, Chief J.) ("[T]here is a limit to what competitors can do in the name of competition.").  Next, if the injunction harms Capital Connect in its communities, it will be entirely due to its own actions violating the Lanham Act.  See *North American Olive Oil Association v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 524 (S.D. N.Y. 2013) (concluding that "any diminished goodwill Kangadis suffers from this injunction will largely be of its own doing").  Third, preventing people from violating the Lanham Act does not restrain speech in

violation of the First Amendment. *Better Business Bureau*, 681 F.2d at 404 ("False and misleading representations in advertising are not shielded by the first amendment; as 'unprotected speech,' such statements may be banned entirely.") (citing *Bates v. State Bar of Arizona*, 433 U.S. 350, 383 (1977) ("the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena"); *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 771-72 (1976)); accord *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Limited*, 604 F.2d 200, 206 (2d Cir. 1979) ("This is not a case of government censorship, but a private plaintiff's attempt to protect its property rights.").

Lastly, preventing one's agents from breaking federal law is not impossible to monitor and accepting that argument would be against public policy. *T-Mobile*, 991 F. Supp. 2d at 929 (concluding that the balance of hardships favored granting injunction where defendant argued that changes were too costly); *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1321 (11th Cir. 2010) (balance of hardships favored granting injunction where effect of injunction only prohibited defendant from using false statements and did not prohibit defendant from using the contested study in its entirety).

Additionally, the court has not granted ADT as wide and broad a preliminary injunction as it requested. The narrow scope of the injunction that solely prevents Capital Connect from continuing to violate the Lanham Act and continuing to

- 54 -

compete unfairly "reduces the impact" of any lawful interests Capital Connect may have through the issuance of this injunction.  See *T-Mobile*, 991 F. Supp. 2d at 929.

ADT's interest in obtaining this preliminary injunction far outweighs Capital Connect's interest in continuing to violate the Lanham Act.  *Chevron Chemical Company v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 705 (5th Cir. 1981) (holding that a violator of the Lanham Act should be required to keep a safe distance from the line between legal and illegal conduct), *cert. denied*, 457 U.S. 1126 (1982).

### 4.  Public Interest

"The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks."  *S & H Industries*, 932 F. Supp. 2d at 765 (quoting *Quantum Fitness Corporation v. Quantum LifeStyle Centers, LLC*, 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999)).  "[T]he public has an interest in not being deceived."  *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344-45 (S.D. N.Y. 2010) (citing *SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980); accord *Natural Rural Electric Co-op Association v. National Agricultural Chemical Association*, No. 91-CV-156826, U.S.P.Q.2d (BNA) 1294, 1299, 1992 WL 477020, at *6 (D.D.C. Nov. 25, 1992) (the public interest lies in avoiding confusion, particularly where defendant would be able to continue its activities)).

The fourth element weighs in favor of granting the preliminary injunction to prevent further violations of the Lanham Act.

All four factors weigh in favor of a preliminary injunction.  The court therefore grants ADT's motion.  All that remains is to determine the scope of that injunction.

## D.  Preliminary Injunction

"[C]ourts in trademark cases have a responsibility to tailor the relief to the violation, a responsibility that includes consideration of disclaimers."  *Westchester,* 214 F.3d at 674.  "As with injunctive relief generally, an equitable remedy for trademark infringement should be no broader than necessary to prevent the deception."  *Id.* at 671 (citing *Soltex Polymer Corporation v. Fortex Industries, Inc.*, 832 F.2d 1325, 1329 (2d Cir. 1987); *Better Business Bureau,* 681 F.2d at 405).

The Fifth Circuit has stated that a "competitive business once convicted of unfair competition . . . should thereafter be required to keep a safe distance away from the margin line even if that requirement involves a handicap as compared with those who have not disqualified themselves."  *Voluntary Purchasing,* 659 F.2d at 705. The law forbids Capital Connect from engaging in any activity that suggests endorsement by, sponsorship by, or affiliation with ADT, and the court will preliminarily enjoin the behavior that Capital Connect currently exhibits in violation of the Lanham Act and principles of unfair competition.  *Mary Kay*, 661 F. Supp. 2d at 644 (broadly enjoining the Lanham Act defendants from violating the law).

The court has modified and narrowed the scope of ADT's proposed preliminary injunction (docket entry 7, Exhibit 1, Proposed Injunction).  First, the court has stricken the word "outdated" from paragraph 1 because preventing a competitor from discussing the age of equipment unduly restrains Capital Connect's speech in its sales pitches.

Next, the court has stricken paragraph 2 in its entirety.[19]  Requiring Capital Connect's sales force to pursue sales like a robot, regurgitating a court ordered script imposes too much restraint on Capital Connect.  Capital Connect's sales force may refer to themselves as representatives of an alarm company or a security company. Further, as most ADT declarants have acknowledged, Capital Connect's sales associates already wear Capital Connect gear and a badge.  This court will not prescribe the clothing Capital Connect's sales force must wear, especially since Capital Connect already requires its sales force to wear Capital Connect gear.  The court expects Capital Connect to enforce, and ensure compliance with, its company policies and code of conduct, which the record shows it has not sufficiently accomplished thus far.

Additionally, the court has stricken "directly or by its agents" in the beginning of paragraph (3), finding it redundant in light of the definition of Enjoined Parties.

---

[19]     Since the court deleted the entirety of paragraph 2 from ADT's proposed preliminary injunction, paragraph 3 from ADT's proposed preliminary injunction is paragraph 2 in this court's preliminary injunction order.

The court has stricken the second half of subparagraph (3)(g) as too broad.  Lastly, the court has narrowed the scope of subparagraph (3)(i) to ensure Capital Connect's speech is not overly restrained beyond misleading statements and false associations.

### III.  CONCLUSION

For the reasons detailed above, the plaintiffs' motion for preliminary injunction is **GRANTED**.  A separate order of preliminary injunction, in conformity with this memorandum opinion and order, will be entered forthwith.

**SO ORDERED**.

October 28, 2015.

A. JOE FISH
**Senior United States District Judge**