UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


| | | |
|---|---|---|
| ADT LLC, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:15-CV-2252-G |
| CAPITAL CONNECT, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |


## MEMORANDUM OPINION AND ORDER

Before the court are the motions for partial summary judgment filed by the

defendants, Capital Connect, Inc. ("Capital Connect"), John Lee, John Backus, Victor

Vega, Trevor McAlees (docket entry 161), and Power Home Technologies, LLC

("PHT") (docket entry 216); and the motion for summary judgment filed by the

defendant, Alliance Security, Inc. ("Alliance") (docket entry 164). For the reasons

stated below, the defendants' motions are granted in part and denied in part.

## I. BACKGROUND

### A. Factual Background

The plaintiff, ADT LLC ("ADT"), provides electronic security services and

equipment to homes and businesses throughout the United States. Complaint ¶ 18

(docket entry 1).  ADT US Holdings, Inc. ("ADT Holdings"), also a plaintiff, owns the ADT trademarks.  *Id.* ¶ 1.  The defendants seeking summary judgment are three alarm-service companies, Capital Connect, Alliance, and PHT, and four individual alarm-salespersons, John Lee, John Backus, Victor Vega, and Trevor McAlees.  See *id.* ¶¶ 4-5, 7, 9-12.  ADT brought this action alleging that the defendants sell alarm systems in unannounced door-to-door sales visits, during which the defendants have made false statements, confusing the homeowners into believing that the defendants were somehow affiliated with ADT.  See *id.* ¶¶ 27-30.  ADT contends that the defendants' sales tactics violate the Lanham Act, 15 U.S.C. § 1125(a), and ADT's rights against unfair competition at common law.  *Id.* at 34-41.

Capital Connect, Alliance, and PHT sell and install alarm systems on behalf of Monitronics International, a direct competitor of ADT.  *See* Brief in Support of Defendants Capital Connect, Inc., John Lee, John Backus, Victor Vega, and Trevor McAlees' Motion for Partial Summary Judgment ("Capital Connect's Brief") at 3-4 (docket entry 162); Alliance's Motion for Summary Judgment and Brief in Support ("Alliance's Brief") at 1 (docket entry 164); PHT's Brief in Support of Its Motion for Partial Summary Judgment ("PHT's Brief") at 3 (docket entry 217).  ADT alleges that each of the defendants' sales forces engaged in false and misleading sales pitches during their door-to-door sales visits, which targeted ADT's customers.  ADT further claims that the defendants' misleading pitches were designed to convince ADT

customers to terminate their contracts with ADT. *See* Plaintiffs' Memorandum in Opposition to Capital Connect's Motion for Partial Summary Judgment ("Plaintiffs' Capital Connect Response") at 2 (docket entry 180); Plaintiffs' Memorandum in Opposition to Alliance's Motion for Summary Judgment ("Plaintiffs' Alliance Response") at 3 (docket entry 179); Plaintiffs' Memorandum in Opposition to PHT's Motion for Partial Summary Judgment ("Plaintiffs' PHT Response") at 2 (docket entry 242).[1]

According to ADT, the defendants' sales forces arrived unannounced at the homes of ADT customers, falsely stated that they were affiliated with ADT, and that the customers' ADT alarm equipment was out of date and needed to be upgraded. See, *e.g.*, Plaintiffs' Capital Connect Response at 6-7 (citing Declaration of Annie May Edwards at 1-2 (docket entry 7-6)); Plaintiffs' Alliance Response at 7 (citing Declaration of Patricia Belcher-Wuchte at 1-2 (docket entry 179-15)); Plaintiffs' PHT Response at 6-7 (citing Deposition of Gladys Walker at 216-17 (docket entry 243)). As a result, ADT's customers signed contracts with the defendants and agreed to the removal of ADT's alarm equipment and the installation of the defendants' equipment. *See* Plaintiffs' Capital Connect Response at 6-7 (citing Declaration of Annie May Edwards at 1-2 (docket entry 7-6)); Plaintiffs' Alliance Response at 7

_____

[1]     ADT has contracts with its customers, which typically run for two to three years. Plaintiffs' Capital Connect Response at 3; Plaintiffs' Alliance Response at 3; Plaintiffs' PHT Response at 3.

(citing Declaration of Patricia Belcher-Wuchte at 1-2 (docket entry 179-15));

Plaintiffs' PHT Response at 6-7 (citing Deposition of Gladys Walker at 216-17

(docket entry 243)).  After receiving complaints, ADT often returned to its

customers' homes to reinstall ADT equipment in place of the defendants' equipment.

*See* Plaintiffs' Capital Connect Response at 2 (citing Declaration of Marcia Gold at 5

(docket entry 7-2)); Plaintiffs' Alliance Response at 3 (citing to same); Plaintiffs'

PHT Response at 2 (citing to same).  The plaintiffs have documented over 700

incidents committed by Capital Connect's sales force, *see* Plaintiffs' Capital Connect

Response at 2; numerous incidents committed by Alliance's sales force, *see* Plaintiffs'

Alliance Response at 3; and at least 135 incidents committed by PHT's sales force, *see*

Plaintiffs' PHT Response at 2.

 The defendants have been aware of the conduct of their sales forces for years.

*See* Capital Connect's Brief at 4; Alliance's Brief at 2-3; PHT's Brief at 4.  In fact, on

August 26, 2013, the plaintiffs entered into a settlement agreement which released all

claims against the defendants as of the date of the agreement.  Capital Connect's

Brief at 4; Alliance's Brief at 2-3; PHT's Brief at 4.  However, nearly all of the

incidents at issue in the present case occurred after the August 26, 2013 settlement

agreement.  *See* Plaintiffs' Capital Connect Response at 12 (citing Complaint at 9-

18); Plaintiffs' Alliance Response at 9 (citing Complaint at 27-31); Plaintiffs' PHT

Response at 12 (citing Complaint at 19-24).

## B. Procedural Background

ADT filed this suit against the defendants on July 7, 2015. *See* Complaint. On the same day, ADT filed a motion for a preliminary injunction against Capital Connect, seeking to enjoin Capital Connect from engaging in false sales pitches. *See generally* Plaintiffs' Motion for a Preliminary Injunction (docket entry 4). On October 28, 2015, this court granted the plaintiffs' motion for a preliminary injunction. Memorandum Opinion and Order Granting the Plaintiffs' Motion for Preliminary Injunction (docket entry 82).

On January 17, 2017, Capital Connect, John Lee, John Backus, Victor Vega, Trevor McAlees, and Alliance filed the instant motions. Capital Connect, Inc., John Lee, John Backus, Victor Vega, and Trevor McAlees' Motion for Partial Summary Judgment (docket entry 161); Alliance's Motion for Summary Judgment (docket entry 164). On February 7, 2017, the plaintiffs filed responses. Plaintiffs' Capital Connect Response; Plaintiffs' Alliance Response. On February 21, 2017, Capital Connect, John Lee, John Backus, Victor Vega, and Trevor McAlees filed a reply to ADT's response to their motion for summary judgment. Reply in Support of Capital Connect, Inc., John Lee, John Backus, Victor Vega, and Trevor McAlees' Motion for Partial Summary Judgment ("Capital Connect's Reply") (docket entry 209). On February 23, 2017, Alliance filed a reply. Alliance's Reply to Plaintiffs' Response to Its Motion for Summary Judgment ("Alliance's Reply") (docket entry 220). Also on

February 23, 2017, PHT filed its motion for partial summary judgment. PHT's

Motion for Partial Summary Judgment (docket entry 216). On March 15, 2017, the

plaintiffs timely filed a response to PHT's motion. Plaintiffs' PHT Response. The

motions are now ripe for decision.

## II. ANALYSIS

### A. Legal Standard

Summary judgment is proper when the pleadings, depositions, admissions,

disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a), (c)(1).[2] A fact is material if the governing substantive

law identifies it as having the potential to affect the outcome of the suit. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue as to a material fact is

genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481,

489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to

merely formal, pretended, or a sham."). To demonstrate a genuine issue as to the

material facts, the nonmoving party "must do more than simply show that there is

---

[2]     Disposition of a case through summary judgment "reinforces the
purpose of the Rules, to achieve the just, speedy, and inexpensive determination of
actions, and, when appropriate, affords a merciful end to litigation that would
otherwise be lengthy and expensive." *Fontenot v. Upjohn Company*, 780 F.2d 1190,
1197 (5th Cir. 1986).

some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in his favor. *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)). However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact. See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

B. Application

1. *Alliance's Evidentiary Objections*

Before considering the merits of Alliance's motion for summary judgment, the court must address its objections to evidence cited in the plaintiffs' summary

judgment response.  The court will consider only the evidentiary objections specifically raised by Alliance.  See *Eguia v. Tompkins*, 756 F.2d 1130, 1136 (5th Cir. 1985) ("Documents presented in support of a motion for summary judgment may be considered even though they do not comply with the requirements of Rule 56 if there is no objection to their use.").

### a.  Alliance's Objections to the Plaintiffs' Exhibit 12

Alliance objects on several grounds to the plaintiffs' exhibit 12 (docket entry 179-12) attached to the plaintiffs' response to Alliance's motion for summary judgment.  Alliance's Reply at 1-2.  However, "because the court did not find it necessary rely on this evidence in support of its decision, these objections are overruled as moot."  *Detgen ex rel. Detgen v. Janek*, 945 F. Supp. 2d 746, 753 (N.D. Tex. 2013) (Fish, J.), *aff'd*, 752 F.3d 627 (5th Cir. 2014).

### b.  Alliance's Objections to the Plaintiffs' Exhibits 15 and 16

Alliance objects to the plaintiffs' exhibits 15 and 16 (docket entries 179-15 and 179-16) attached to the plaintiffs' response to Alliance's motion for summary judgment, contending that the exhibits (1) fail to meet the requirements of 28 U.S.C. § 1746(2); (2) fail to meet the requirements of Fed. R. Civ. P. 56(c)(4); and (3) contain unsupported speculation and are replete with hearsay.  Alliance's Reply at 2-3.  Exhibit 15 is the declaration of ADT customer Patricia Belcher-Wuchte (docket

entry 179-15) and exhibit 16 is the declaration of ADT customer Phyllis Conlon (docket entry 179-16).

As to Alliance's first objection, 28 U.S.C. § 1746 requires that declarations "substantially" follow the requirements of the statute.[3] *See* 28 U.S.C. § 1746. Here, both declarations were signed, dated, and end with the following statement: "I understand that false statements made herein are made subject to the penalties of [section 1746]." Declaration of Patricia Belcher-Wuchte at 4 (docket entry 179-15); Declaration of Phyllis Conlon at 4 (docket entry 179-16). The court concludes that the declarants have substantially adhered to the requirements of section 1746. Therefore, Alliance's first objection is overruled.

As to Alliance's second objection, Rule 56(c)(4) requires that

> [a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. 56(c)(4). Here, both exhibits are based on the declarants' personal knowledge and both declarants appear to be competent to testify. *See generally* Declaration of Patricia Belcher-Wuchte at 1 (docket entry 179-15); Declaration of

---

[3]       Section 1746(2) states, "[i]f executed within the United States, its territories, possessions, or commonwealths [the declaration shall include the following]:  'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.  Executed on (date).  (Signature).'" 28 U.S.C. § 1746(2).

Phyllis Conlon at 1 (docket entry 179-16). While Alliance does not specify which requirements of Rule 56(c)(4) are not met, presumably Alliance contends that the declarations do not contain facts that would be admissible in evidence, reasoning that the declarations contain "unsupported speculation and [are] replete with hearsay." Alliance's Reply at 2-3. It is true that "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston, Texas*, 337 F.3d 539, 541 (5th Cir. 2003). However, the court concludes that the declarations in question do not contain unsubstantiated assertions or speculation and are not so devoid of details to render any inferences improbable. Moreover, the court concludes that any relevant statements that could be considered hearsay are exempt as opposing party statements. *See* FED. R. EVID. 801(2)(D). Therefore, Alliance's objections are overruled.

### 2. *Whether Alliance Had a Principal-Agency Relationship with Its Sales Force*

Alliance contends that it is not liable for the actions of its sales force because it does not have a principal-agency relationship with its sales force. *See* Alliance's Brief at 4-5. Rather, Alliance contends that its sales force is comprised of independent contractors. *Id.* Under Texas law, "an employer is vicariously liable for the negligence of an agent or employee acting within the scope of his or her agency or employment, although the principal or employer has not personally committed a

wrong."  See *Baptist Memorial Hospital System v. Sampson*, 969 S.W.2d 945, 947 (Tex.

1998) (noting that an employer is liable for the actions of its employees when the

employee is acting within the scope of his/her employment and "the employer has the

right to control the means and methods of the agent or employee's work").  "The

essential element of an agency relationship is the right of control."  *In re Carolin*

*Paxson Advertising, Inc.*, 938 F.2d 595, 598 (5th Cir. 1991).  To determine whether an

employer exercises sufficient control over a worker to render the worker an agent,

courts look to:

> (1) [t]he independent nature of his business; (2) his
> obligation to furnish necessary tools, supplies, and material
> to perform the job; (3) his right to control the progress of
> the work, except as to final results; (4) the time for which
> he is employed; and (5) the method of payment, whether
> by time or by the job.

*Texas A & M University v. Bishop*, 156 S.W.3d 580, 584-85 (Tex. 2005) (quoting

*Industrial Indemnity Exchange v. Southard*, 160 S.W.2d 905, 907 (Tex. 1942)).  This

court previously found that Capital Connect exercised sufficient control over its sales

force when

> (a) it requires its sales force to wear Capital Connect gear;
> (b) it requires its sales force to complete training; (c) it
> requires its sales force to sign a Code of Conduct; (d) it
> requires its sales force to wear a Capital Connect badge;
> (e) it requires its sales force to obey its sales rules; and
> (f) it punishes its sales force if it violates any of these
> provisions.

*ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 692 (N.D. Tex. 2015) (Fish, J.) (internal citations omitted).

An independent contractor, on the other hand, "has sole control over the means and methods of the work to be accomplished . . . [and] the individual or entity that hires the independent contractor is generally not vicariously liable for the tort or negligence of that person." *Baptist Memorial Hospital System*, 969 S.W.2d at 947. "It is the principal's extent of control over the details of accomplishing the assigned task that primarily distinguishes the status of independent contractor from that of agent." *Indian Harbor Insurance Co. v. Valley Forge Insurance Group*, 535 F.3d 359, 364 (5th Cir. 2008) (quoting *Happy Industrial Corporation v. American Specialties, Inc.*, 983 S.W.2d 844, 852 (Tex. App.--Corpus Christi 1998, writ dism'd w.o.j.)).

Here, ADT has submitted evidence that Alliance's in-person sales force used stationery and gear with Alliance logos, including wearing Alliance badges, *see* Plaintiffs' Alliance Response at 1-2 (citing exhibit 1 (docket entry 179-1), exhibit 2 (docket entry 179-2), and Declaration of Phyllis Conlon at 1-2 (docket entry 179-16)); Alliance promulgates rules for its sales force to follow, see *id.* at 2 (citing exhibit 3 (docket entry 179-3)); Alliance requires its sales force to obey its rules, see *id.*; Alliance punishes its sales force for not complying with its rules, see *id.* (citing exhibit

5 (docket entry 179-5));[4] and Alliance furnishes supplies necessary for the job, see *id.* (citing Declaration of Phyllis Conlon at 2 (docket entry 179-16) (providing an Alliance "security cover")).  Accordingly, Alliance exercises sufficient control over its in-person sales force to constitute a principal-agency relationship.[5]

Additionally, anything that occurs during the sales forces' pitches is clearly within the scope of the agency, as it is the central purpose of the principal-agency relationship here.  *Celtic Life Insurance Company v. Coats*, 885 S.W.2d 96, 99 (Tex. 1994) (holding that a principal cannot escape liability by claiming that it did not authorize misrepresentations occurring before a sale and that such misrepresentation occurred within the scope of agency); *Morrow v. Daniel*, 367 S.W.2d 715, 718 (Tex. App.--Dallas 1963, no writ) (same).  Therefore, Alliance is liable for the actions of its

---

[4]	In its reply, Alliance contends "ADT has presented no evidence that Alliance controlled or 'punished any door-to-door sales agents' as asserted in ADT's SOF No. 6."  Alliance's Reply at 6.  Exhibit 5 demonstrates that Alliance terminated its "business relationship" with numerous sales force members in response to "recent unethical and possibly illegal" conduct.  *See generally* Plaintiffs' Alliance Response, exhibit 5 (docket entry 179-5).  Taking all reasonable inferences in favor of the plaintiffs, the court can reasonably construe Alliance's actions as a form of punishment.

[5]	Alliance also employs telemarketers to sell its security systems.  *See* Plaintiffs' Alliance Response at 2-3.  It appears to be undisputed that Alliance's telemarketers are Alliance's agents.  Specifically, Alliance trains its telemarketers, *see* Plaintiffs' Alliance Response at 2 (citing exhibit 9 (docket entry 179-9)); Alliance's telemarketers are governed by an employee handbook, see *id.* (citing exhibit 10 (docket entry 179-10)); and Alliance controls its telemarketers by providing scripts, see *id.* at 3 (citing exhibit 8 (docket entry 179-8), exhibit 9 (docket entry 179-9), and exhibit 11 at 6-7 (docket entry 179-11)).

sales force, who are its agents, operating within the scope of that agency. See *Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 553-54 (N.D. Tex. 1997) (Sanders, J.) (holding an employer liable for an employee's infringement where the former had supervisory authority over the latter's activities), *aff'd,* 168 F.3d 486 (5th Cir. 1999).

### 3. *Whether ADT Holdings's Claim for Damages Fails as a Matter of Law*

Capital Connect and PHT contend that the record lacks evidence demonstrating that ADT Holdings suffered damages in this action. *See* Capital Connect's Brief at 5-6; PHT's Brief at 5-7. Specifically, the defendants contend that ADT Holdings has only stated that its damages flow through its trademark license agreement with ADT. Capital Connect's Brief at 6 (citing appendix at 20, 26-32 (docket entry 163)); PHT's Brief at 6 (citing appendix at 29, 36-42 (docket entry 218)). Moreover, the defendants point to ADT's admission that "none of the customers, which Plaintiffs allege Defendants caused to terminate their existing ADT agreements and execute new customer contracts with Defendants, was a customer of ADT US Holdings, Inc." Capital Connect's Brief at 6 (quoting appendix at 46 (docket entry 163)); *see* PHT's Brief at 6 (citing appendix at 15-16 (docket entry 218)). Thus, Capital Connect and PHT conclude that they are entitled to summary judgment on all of ADT Holdings's claims for damages. Capital Connect's Brief at 6; PHT's Brief at 6-7.

The plaintiffs contend that ADT Holdings has standing to sue and that the Fifth Circuit has held that a trademark licensor is a necessary party to any infringement action brought by a licensee. Plaintiffs' Capital Connect Response at 4-5 (citing 15 U.S.C. § 1125(a)(1) and *Association of Co-Operative Members, Inc. v. Farmland Industries, Inc.*, 684 F.2d 1134, 1143 (5th Cir. 1982), *cert. denied*, 460 U.S. 1038 (1983)); Plaintiffs' PHT Response at 3-4 (citing to same). Moreover, the plaintiffs contend that ADT submitted evidence of damages based on the royalty that the defendants should have paid to ADT for the use of ADT's trademark; that royalty, the plaintiffs contend, also belongs to ADT Holdings. Plaintiffs' Capital Connect Response at 5; Plaintiffs' PHT Response at 4. In Capital Connect's reply, it maintains that the plaintiffs have produced no quantifiable evidence, through an expert or otherwise, that ADT Holdings is entitled to damages. Capital Connect's Reply at 3.

It is true that the Fifth Circuit has stated that "the licensor of a trademark is usually treated as a necessary or indispensable party in an infringement action by its licensee." *Association of Co-Operative Members, Inc.*, 684 F.2d at 1143. In *Association of Co-Operative Members, Inc.*, the Fifth Circuit was concerned about protecting the rights of the licensor in the event of judgment for the alleged infringer and avoiding double obligations for the alleged infringer in the event of judgment for the licensee. *Id.* The same concerns are present here.

Moreover, the plaintiffs submitted evidence of the royalty amount the defendants owed to ADT for violations of the Lanham Act and the Texas Business and Commerce Code. *See* Plaintiffs' Brief in Opposition to Alliance's Motion to Strike/Exclude Plaintiffs' Experts (docket entry 177), exhibit A, Expert Report of Russell W. Magnum III at 5 (docket entry 177-1). As the plaintiffs correctly contend, it is reasonable to infer that ADT Holdings, as owner and licensor of the ADT trademarks, would have received the benefit of any royalties paid to ADT for use of the ADT trademarks. *See* Plaintiffs' Capital Connect Response at 4-5; Plaintiffs' PHT Response at 4. Taking reasonable inferences in favor of the plaintiffs, the court infers that failure to pay royalties to the trademark licensee also precludes the licensor from receiving any benefits from the royalty. Thus, the defendants' motions are denied as to ADT Holdings.

4. *Whether ADT's Unfair Competition Claim Fails as a Matter of Law*

Unfair competition under Texas law "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Taylor Publishing Company v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (quoting *American Heritage Life Insurance Company v. Heritage Life Insurance Company*, 494 F.2d 3, 14 (5th Cir. 1974), *abrogated by B & B Hardware, Inc. v. Hargis Industries, Inc.*, ___ U.S. ___, 135 S. Ct. 1293 (2015)). To succeed on an unfair competition claim, a plaintiff must show an act by

the defendant that, at a minimum, constitutes an independent tort. *Taylor Publishing Company*, 216 F.3d at 486. Here, the plaintiffs assert three independent torts: (1) violation of the Texas Deceptive Trade Practices Act ("DTPA"); (2) tortious interference with contract; and (3) violations of Section 43(a) of the Lanham Act.[6] *See* Plaintiffs' Capital Connect Response at 5-8; Plaintiffs' Alliance Response at 5-8; Plaintiffs' PHT Response at 5-8. The defendants contend that the plaintiffs have failed submit evidence for any of the above torts. Capital Connect's Brief at 7; Alliance's Brief at 5; PHT's Brief at 7.

First, the defendants contend that the DTPA is inapplicable here because the DTPA only applies to consumers and not sellers, and ADT is not a consumer. Capital Connect's Brief at 7-8; Alliance's Brief at 6-7; PHT's Brief at 8-9. The court agrees and concludes that the plaintiffs' claim under the DTPA cannot serve as the independent tort to support their unfair competition claim. See *Broyles v. Chase Home Finance*, No. 3:10-CV-2256-G, 2011 WL 1428904, at *3 (N.D. Tex. Apr. 13, 2011) (Fish, J.) ("To prevail on a DTPA cause of action, the plaintiffs must establish that they are consumers who sought or acquired, by purchase or lease, goods or services that form the basis of their complaint."); *Cenorin, LLC v. Tacy Medical, Inc.*, No. 3:12-

---

[6] The court does not address the plaintiffs' claim arising from Section 43 of the Lanham Act because it does not appear to be contested and the plaintiffs' tortious interference with contract claim is sufficient to serve as the underlying tort for the plaintiffs' unfair competition claim.

CV-1745-L, 2013 WL 1194473, at *4-5 (N.D. Tex. Mar. 25, 2013) (Lindsay, J.) (dismissing an unfair competition claim without considering whether the defendant's underlying conduct violated the DTPA when the defendant was not a "consumer" under the DTPA).

However, the plaintiffs have submitted evidence showing that the defendants have committed tortious interference with contract. To recover for tortious interference with contract under Texas law, a plaintiff must prove: "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred." *Amigo Broadcasting, LP v. Spanish Broadcasting System, Inc.*, 521 F.3d 472, 489 (5th Cir. 2008) (citing *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)). "Interference includes conduct that makes performance burdensome, difficult, or of less or no value to the one entitled to performance." *Wilkerson v. University of North Texas*, No. 4:15-CV-00540, 2016 WL 7242766, at *8 (E.D. Tex. Dec. 14, 2016) (citing *International Union United Automobile Aerospace & Agricultural Implement Workers of America Local 119 v. Johnson Controls, Inc.*, 813 S.W.2d 558, 568 (Tex. App.--Dallas 1991, writ denied) ("It is not necessary that the alleged tortious conduct result in an actual breach or cessation of the contractual relationship. . . . It is sufficient that the tortious conduct make performance more burdensome or difficult.") (internal citations omitted)).

Moreover, tortious interference may serve as the underlying tort in an unfair competition claim. See *Nova Consulting Group, Inc. v. Engineering Consulting Services, Ltd.*, 290 Fed. App'x 727, 734 (5th Cir. 2008) ("Nova's underlying tort claims were for misappropriation of trade secrets and tortious interference with its employment agreements.").

Here, the plaintiffs have submitted evidence of contracts. *See* Plaintiffs' Capital Connect Response at 6-7 (citing exhibits 2-3 (docket entries 180-2 and 180-3)); Plaintiffs' Alliance Response at 7 (citing exhibit 14 (docket entry 179-14) and Declaration of Patricia Belcher-Wuchte at 1 (docket entry 179-15)); Plaintiffs' PHT Response at 6 (citing exhibit 3 at 100-105 and Deposition of Gladys Walker at 212-15 (docket entry 243)). However, the defendants contend that the plaintiffs have failed to submit evidence showing willful and intentional conduct. Capital Connect's Reply at 9-10; Alliance's Reply at 9; *see* PHT's Brief at 10.

In order to prove that a defendant willfully and intentionally interfered with a contract, courts look to whether the defendant had knowledge of the contract and subsequently took improper steps to interfere with it. See *Steinmetz & Associates, Inc. v. Crow*, 700 S.W.2d 276, 277-78 (Tex. App.--San Antonio 1985, writ ref'd n.r.e.) (noting that the defendant must have "actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business

relationship"); *Settlement Funding LLC v. RSL Funding, LLC*, 3 F. Supp. 3d 590, 607-08 (S.D. Tex. 2014) (holding that the defendant satisfied this element by taking actions to interfere with the plaintiff's contract with the requisite knowledge).

Here, the plaintiffs point to numerous instances where the defendants intentionally interfered with ADT's contracts. The plaintiffs' have submitted evidence that the defendants' sales forces entered the homes of elderly ADT customers under the pretense of being affiliated with ADT, and then convinced ADT's customers to replace their ADT alarm equipment with the defendants' equipment. *See generally* Declaration of Julio Rivera at 1-2 (docket entry 7-3); Declaration of Martin Price at 1-2 (docket entry 7-4); Declaration of Annie May Edwards at 1-2 (docket entry 7-6); Declaration of Doris Rohl at 1-2 (docket entry 7-7); Declaration of Patricia Belcher-Wuchte at 1-2 (docket entry 179-15); Declaration of Phyllis Conlon at 1-2 (docket entry 179-16); Deposition of Gladys Walker at 216, 220-21 (docket entry 243); Declaration of Wendy Cato at 181-83 (docket entry 243); Declaration of Kay Thomas at 139-40 (docket entry 243). It is entirely reasonable to infer that the defendants' sales forces engaged in this conduct with full knowledge of ADT's contracts.

Specifically, as to Capital Connect, the plaintiffs submitted evidence that Capital Connect's sales force explicitly discussed ADT's contracts prior to convincing ADT customers to replace their alarm equipment. *See* Declaration of Julio Rivera at

1-2 (docket entry 7-3) ("[The representative] told me he was with ADT. . . . [and] handed me step by step instructions on how to cancel by ADT contract."); Declaration of Martin Price at 1-2 (docket entry 7-4); Declaration of Annie May Edwards at 1-2 (docket entry 7-6). For example, a Capital Connect agent went to ninety-one year old Annie May Edwards's home and falsely told her that he worked for ADT and then convinced her to subscribe to Capital Connect. Declaration of Annie May Edwards at 1 (docket entry 7-6). Later, a Capital Connect technician came to her house and installed Capital Connect equipment in place of her ADT equipment. *Id.* at 2. After Edwards discovered the scheme, she canceled her Capital Connect contract. *Id.* Boldly, the Capital Connect agent then attempted to return to Edwards's home to convince Edwards to keep her Capital Connect contract. *Id.* After declining, the Capital Connect representative became upset with Edwards and stated "My boss is not going to understand about you cancelling your contract." *Id*.

Sales agents of Alliance and PHT engaged in similar conduct. With full knowledge of ADT's contracts with its customers, Alliance and PHT's sales forces intentionally made false statements and took actions that improperly interfered with ADT's contracts. *See* Declaration of Patricia Belcher-Wuchte at 1-2 (docket entry 179-15) (noting that an Alliance sales force member falsely stated that Belcher-Wuchte's contract with ADT had expired); Declaration of Phyllis Conlon at 1-2 (docket entry 179-16) (declaring that an Alliance sales force member stated that

Alliance was affiliated with ADT, convinced Conlon to sign an Alliance contract, replaced her ADT equipment with Alliance equipment, and covered Conlon's ADT yard sign); Deposition of Gladys Walker at 216, 220-21 (docket entry 243) (discussing how a PHT sales force member led the ADT customer to believe that he worked for ADT, convinced the ADT customer to sign a PHT contract, and installed PHT equipment); Declaration of Wendy Cato at 181-83 (docket entry 243) (declaring that after the PHT technician falsely stated that he worked for ADT and installed PHT equipment, he added "Don't forget to call ADT to cancel service, so you will not be billed twice"). Thus, the plaintiffs have submitted sufficient evidence to show that the defendants intentionally and willfully interfered with ADT's contracts.

Additionally, proximate cause is clearly satisfied because the defendants' sales forces caused ADT customers to terminate their contracts, or at a minimum, made ADT's performance more burdensome or difficult by replacing the customers' equipment. See *Official Brands, Inc. v. Roc Nation Sports, LLC*, No. 3:15-CV-2199-B, 2015 WL 8915804, at *4 (N.D. Tex. Dec. 15, 2015) (Boyle, J.) ("It follows logically, then, that proximate cause is shown in a case such as this when a plaintiff alleges that the defendant actively persuaded a party to an at-will contract to terminate it."); see also *International Union United Automobile Aerospace & Agricultural Implement Workers of America Local 119*, 813 S.W.2d at 568; *Settlement Funding LLC*, 3 F. Supp. 3d at 608.

Lastly, the plaintiffs have suffered damages as a result due to "the labor and equipment required to reinstate the customer's account."  Plaintiffs' Capital Connect Response at 2 (citing Declaration of Marcia Gold at 5 (docket entry 7-2)); Plaintiffs' Alliance Response at 3 (citing to same); Plaintiffs' PHT Response at 2 (citing to same).  Thus, the plaintiffs have raised a genuine dispute as to whether the defendants tortiously interfered with the plaintiffs' contracts.

5. *Whether ADT's Claim for Punitive Damages Fails as a Matter of Law*

Capital Connect and PHT contend that the plaintiffs have failed to plead, or offer any evidence, that the defendants are liable for punitive damages.  Capital Connect's Brief at 9-11; Capital Connect's Reply at 4-5; PHT's Brief at 10-11.  Texas law provides for punitive damages for injuries resulting from "fraud, malice, or gross negligence."  TEX. CIV. PRAC. AND REM. CODE § 41.003.  "In order for a plaintiff to recover punitive damages on a claim, the factfinder must find that the defendant acted willfully."  *Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 982 (S.D. Tex. 1997) (holding that the plaintiff's punitive damages claim failed because the jury did not find that the defendants willfully engaged in unfair competition).

a. Conduct of the Defendants' Sales Forces

Capital Connect and PHT first contend that the plaintiffs have failed to plead the existence of any conduct giving rise to recover punitive damages under Texas law.  Capital Connect's Brief at 9-11; PHT's Brief at 10-11.  However, the plaintiffs have

sufficiently pled the requisite conduct. The complaint sets forth detailed allegations that Capital Connect and PHT's sales agents willfully misled ADT's customers about the agents' respective affiliations. *See generally* Complaint at 8-24. Specifically, ADT alleged that Capital Connect and PHT agents falsely told ADT customers that they worked on behalf of ADT. *Id.* These allegations, viewed in the light most favorable to the plaintiffs, permit a plausible inference that the defendants' sales forces had the specific intent to cause injury to ADT. See *Biggers v. BAC Home Loans Servicing, LP*, 767 F. Supp. 2d 725, 735 (N.D. Tex. 2011) (Fitzwater, Chief J.) (holding that the plaintiff must plausibly plead a claim for punitive damages).

Moreover, the plaintiffs have supported their allegations with sufficient evidence. There is no question that the defendants' sales forces' conduct discussed in section four, *supra*, far exceeds the minimum showing of evidence required to create a genuine dispute as to whether the defendants' sales forces acted with the purpose to injure ADT. See *Clements v. Withers*, 437 S.W.2d 818, 822 (Tex. 1969) ("[T]o support the recovery of punitive damages in such a case, there must be a finding of actual malice: ill-will, spite, evil motive, or purposing the injuring of another.").

b. Whether Capital Connect Can Be Liable for Punitive
Damages for the Acts of Its Agents

Capital Connect next contends that the plaintiffs have failed to plead facts or submit evidence "that Capital Connect authorized or ratified the claimed wrongful acts of its 'sales representatives' or that Capital Connect was grossly negligent in

hiring unfit agents . . . or that any of [its] 'sales representatives' . . . were vice principals of Capital Connect."[7]  Capital Connect's Brief at 10-11; Capital Connect's Reply at 4-5.

It is true that in order to recover punitive damages against corporations, the plaintiff must prove that the corporation authorized or ratified an agent's gross negligence, malice, or fraud; that the corporation was grossly negligent in hiring an unfit agent; or that the tortfeasor was a vice principal of the corporation.  *Mobil Oil Corporation v. Ellender*, 968 S.W.2d 917, 921-22 (Tex. 1998).  A corporation has acted with gross negligence when

> (1) viewed objectively from the [corporation's] standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the [corporation] must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

*Id.* at 921.  The Texas Supreme Court in *Mobil Oil Corporation* goes on to say:

> [w]hether the corporation's acts can be attributed to the corporation itself, and thereby constitute corporate gross negligence, is determined by reasonable inferences the factfinder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages.

------

[7]     PHT did not raise this issue in its motion for summary judgment. However, even if it did, it appears that such an argument would fail for the same reasons that Capital Connect's argument fails.

*Id.* at 922.

Here, there is no question that the plaintiffs have pled that Capital Connect knew that its sales force was engaging in widespread and egregious misconduct. The plaintiffs specifically alleged that despite their numerous cease and desist letters to Capital Connect from October 2014 to April 2015, ADT received at least ninety new reports involving Capital Connect's sales force. Complaint ¶ 42. Based on these allegations, it is entirely plausible for the court to infer that Capital Connect improperly retained its sales agents or failed to take appropriate action and proceeded with a conscious indifference to the rights of ADT. Thus, the plaintiffs have sufficiently alleged that Capital Connect acted with gross negligence in hiring or retaining its sales force.

Moreover, contrary to Capital Connect's assertions, the plaintiffs have produced evidence showing the same. The record demonstrates that in addition to ADT's cease and desist letters, numerous ADT customers contacted and complained to Capital Connect about their agents' conduct. *See* Declaration of Annie May Edwards at 2 (docket entry 7-6) (calling Capital Connect); Declaration of Gertrude Herring at 27-28 (docket entry 18-2) (same); Declaration of Marnel Mays at 45-46 (docket entry 18-2) (same); Plaintiffs' Capital Connect Response, exhibit 5 at 20 (docket entry 180-7). Yet, the record shows that Capital Connect has failed to fire a single employee for the above misconduct. *See* Plaintiffs' Capital Connect Response

at 9 (citing exhibit 4 at 6-7 (docket entry 180-6) and exhibit 5 (docket entry 180-7)). The high number of incidents occurring after the August 26, 2013 settlement agreement, the plaintiffs' cease and desist letters, and customer complaints show Capital Connect's complicity with the actions of its sales force. Capital Connect fails to point to any evidence in the record that it took adequate measures to mitigate the egregious misdeeds of its sales team. See *Mobil Oil Corporation*, 968 S.W.2d at 921.

The court concludes that the factfinder could reasonably infer that Capital Connect's failure to adequately respond, train, or hire a fit sales force rises at least to the level of gross negligence. See *id.* In sum, the plaintiffs have presented sufficient evidence to permit them to present their punitive damages at trial. See *Lee v. BMCY, Inc.*, No. 3-01-CV-1262-BD, 2002 WL 31045979, at *5 (N.D. Tex. Sept. 11, 2002) (Kaplan, M.J.) ("Although this evidence, standing alone, likely would not support a punitive damage award, the court declines to deprive plaintiffs of the opportunity to present additional evidence at trial."). Thus, the defendants' motions are denied as to the plaintiffs' claims for punitive damages.

### 6. *Loss of Goodwill or Reputation*

Capital Connect and PHT contend that the plaintiffs have presented no evidence of loss of goodwill or reputation and appear to contend that the plaintiffs cannot because such damages are difficult or impossible to quantify. *See* Capital Connect's Brief at 11-12; PHT's Brief at 11. The plaintiffs contend that injury to

their goodwill or reputation are compensable harms despite the inherent inability to quantify such damages.  Plaintiffs' Capital Connect Response at 10-12 (citing *Skydive Arizona v. Quatrocchi*, 673 F.3d 1105, 1112-13 (9th Cir. 2012)); Plaintiffs' PHT Response at 10-12 (citing to same).

Here, the plaintiffs have failed to point to any summary judgment evidence showing that the defendants harmed the plaintiffs' reputation or goodwill.  The plaintiffs have submitted evidence showing that "ADT spends about $150 to $160 million a year to build and maintain its brand."  Plaintiffs' Capital Connect Response at 12 (citing exhibit 1 at 185-87 (docket entry 180-1)); *see* Plaintiffs' PHT Response at 11-12.  While it is true that the plaintiffs do not need to specifically quantify any loss of goodwill damages, see *Skydive Arizona*, 673 F.3d at 1112-13, the plaintiffs must still submit summary judgment evidence.  In *Skydive Arizona, Inc.*, the Ninth Circuit upheld a jury's damages award against the defendant for loss of goodwill or reputation.  *Id.* at 1112.  The *Skydive Arizona, Inc.* court stated, "[i]n measuring harm to goodwill, a jury may consider a plaintiff's expenditures in building its reputation in order to estimate the harm to its reputation after a defendant's bad acts."  *Id.*  The plaintiffs interpret this language to mean evidence that "ADT spends about 150 to $160 million a year to build and maintain its brand" is sufficient, without more, to raise a genuine dispute of material fact over its loss of goodwill or reputation.  *See* Plaintiffs' Capital Connect Response at 12 (citing exhibit 1 at 186-87 (docket entry

180-1)); Plaintiffs' PHT Response at 11-12.  However, the plaintiff in *Skydive Arizona,*

*Inc.* not only submitted evidence of its goodwill expenditures, but also evidence that

the defendants' actions *harmed* the plaintiff's brand in the minds of customers.  See

*Skydive Arizona, Inc.*, 673 F.3d at 1112 ("[The plaintiff] then presented to the jury

multiple declarations and witness testimony proving that customers were very angry

with, and blamed Skydive Arizona for, problems caused by [the defendant].").  Here,

the plaintiffs have not identified any such evidence or any evidence showing that

ADT incurred any expenses rehabilitating its brand.  Accordingly, summary judgment

is granted as to the plaintiffs' damages for loss of goodwill or reputation.

### 7.  *Whether the Plaintiffs' Claims Are Barred by the 2013 Settlement Agreement*

The defendants contend that the August 26, 2013 settlement agreement bars

all of the plaintiffs' claims arising prior to that date.  Capital Connect's Brief at 12-

13; Alliance's Brief at 2-3; PHT's Brief at 12.  However, as the plaintiffs correctly

aver, the plaintiffs' claims in this case are grounded in the defendants' conduct

occurring after August 26, 2013.  *See* Complaint at 8-31; see, *e.g.*, Declaration of Julio

Rivera at 1 (docket entry 7-3); Declaration of Patricia Belcher-Wuchte at 1 (docket

entry 179-15); Deposition of Gladys Walker at 215 (docket entry 243).  Accordingly,

the defendants' motions are granted as to claims -- if any -- arising before August 26,

2013; however, summary judgment is denied as to the plaintiffs' claims arising from

the defendants' conduct occurring after August 26, 2013.

## III. CONCLUSION

For the reasons stated above, the defendants' motions are **GRANTED** in part and **DENIED** in part. The motions filed by the defendants, Capital Connect, John Lee, John Backus, Victor Vega, Trevor McAlees, and PHT, are **GRANTED** as to the plaintiffs' claim for damages for loss of goodwill or reputation and any claims arising prior to August 26, 2013, and **DENIED** on all other claims. Alliance's motion is **GRANTED** as to any claims arising prior to August 26, 2013, and **DENIED** on all other claims.

**SO ORDERED**.

April 21, 2017.

**A. JOE FISH**
**Senior United States District Judge**